Susan AUGIENELLO, Richard J. Doran, Philip Einhorn, Craig Nazarro, and Eileen Papp, Plaintiffs,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Superior Bank FSB, Defendant.**

No. 02 Civ.4317(RWS).

United States District Court,
S.D. New York.

March 25, 2004.

---

1. The Decision and Order is reported at *Pellington v. Greiner,* No. 03 Civ. 7220(VM), 2004 WL 444563 (S.D.N.Y. Mar.10, 2004).

Susan Augienello, Pomona, NY, pro se.

Richard J. Doran, Ringwood, NJ, pro se.

Philip Einhorn, Wake Forrest, NC, pro se.

Craig Nazarro, Manhasset, NY, pro se.

Eileen Papp, Ramsey, NJ, pro se.

Federal Deposit Insurance Corporation, New York Legal Services Office, New York, NY (Thomas M. Clark, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Superior Bank, FSB ("Superior") (the "FDIC–Receiver"), has moved to dismiss the amended complaint of *pro se* plaintiffs Susan Augienello ("Augienello"), Richard J. Doran ("Doran"), Philip Einhorn ("Einhorn"), Craig Nazzaro ("Nazzaro") and Eileen Papp ("Papp") (collectively, the "Plaintiffs"), pursuant to Fed.R.Civ.P. 12(b)(1) for lack of jurisdiction over the subject matter and 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion is granted.

### Prior and Related Proceedings

On June 10, 2002, the Plaintiffs commenced the instant case and on December 18, 2003 filed their amended complaint.

According to the amended complaint, the Office of Thrift Supervision ("OTS") closed Superior and appointed the FDIC as receiver for Superior on July 27, 2001. The FDIC–Receiver refused to remit to the Plaintiffs certain deferred compensation to which the Plaintiffs allege they were entitled under their employment agreements with Superior. Amended Complaint, ¶¶ 3–5, 29, 42. In October 2001, "pursuant to the mandate of 12 U.S.C. § 1821(D)," the Plaintiffs timely filed proofs of claim with the FDIC–Receiver in order to assert, through the receivership claim process, claims for deferred compensation they were allegedly owed under their employment agreements with Superior. Amended Complaint, ¶¶ 14, 30–34. In April 2002, the Plaintiffs' receivership claims were either disallowed by the FDIC–Receiver, deemed disallowed by operation of law, or otherwise rejected by the FDIC–Receiver. Amended Complaint, ¶¶ 14, 35–38.

On December 20, 2001, the Plaintiffs in the instant case commenced a related action, *Augienello v. Coast–To–Coast Financial Corp.*, U.S. District Court for the Southern District of New York, Civil Action No. 01 Civ. 11608 ("the *Coast–To–Coast* case") against numerous defendants (including Superior's beneficial owners, board members, and certain of Superior's officers) but not against the FDIC–Receiver or Superior. In that complaint in the *Coast–To–Coast* case, the Plaintiffs asserted that the defendants were liable to them for the deferred compensation that they were allegedly owed under their employment agreements with Superior.

In an August 7, 2002 opinion in the *Coast–To–Coast* case, the breach of contract claims were dismissed for failure to state a claim upon which relief can be granted, holding that the Plaintiffs are not entitled to any deferred compensation under the terms of their employment agreements with Superior, as interpreted under federal law. *Augienello v. Coast–To–Coast Financial Corp.*, 2002 WL 1822926 (S.D.N.Y. Aug.7, 2002).

The Plaintiffs appealed from the August 7, 2002 opinion in the *Coast–To–Coast* case to the U.S. Court of Appeals for the Second Circuit. By agreement of counsel and with the consent of the court, further proceedings in the instant case were deferred until after the disposition of that appeal.

On May 9, 2003, the Court of Appeals issued a summary order affirming the August 7, 2002 decision in the *Coast–To–Coast* case and stated, "Because we agree with the district court's conclusion that the plaintiffs did not have any vested rights under the employment contracts, the only remaining argument for a claim against Superior is for a breach of the implied covenant of good faith and fair dealing." *Augienello v. Coast–To–Coast Financial Corp.*, 64 Fed.Appx. 820, 822 n. 1, 2003 WL 21069080 (2d Cir. May 9, 2003).

After the Second Circuit issued its May 9, 2003 ruling, the Plaintiffs filed their amended complaint on November 10, 2003 which is identical to their original complaint in this case except for the addition of a new Count II, which alleges a cause of action against the FDIC–Receiver for breach of "its duty of good faith and fair dealing in its dealings with plaintiffs." Amended Complaint, ¶¶ 44–48.

The instant motion by the FDIC–Receiver was submitted on January 28, 2004.

### The Facts

The following facts are undisputed except as noted.

On December 30, 1998, Lyons Savings, a Federal Savings and Loan Association located in Countryside, Illinois, was merged into Lyons Savings Bank, a Federal Savings Bank located in Hinsdale, Illinois. On April 27, 1989 Lyon Savings Bank was renamed Superior Bank, FSB. From April 27, 1989 to July 27, 2001, Superior was a federally chartered savings association.

In December 1992, Alliance Funding Company, Inc. was merged into Superior and became Alliance Funding, a division of Superior. Thereafter, and until Superior was placed in receivership, Alliance Funding was not a separate corporation, but rather a division of Superior.

On July 27, 2001, the federal OTS, which was then Superior's primary regulator, placed Superior into receivership and appointed the FDIC as receiver.

In OTS Order 2001–56, dated July 27, 2001, the OTS, *inter alia:* (1) found that Superior was in an unsafe and unsound condition to transact business; and (2) appointed the FDIC as receiver for Superior. The FDIC accepted that appointment pursuant to 12 U.S.C. § 1821(c)(2)(A).

From December 1992 until July 27, 2001, Superior maintained its corporate offices in Hinsdale, Illinois and in Oakbrook Terrace, Illinois. During this same period, Superior also operated approximately seventeen branch banking offices (seven full-service branch offices, which included teller or check cashing functions, and ten financial centers without teller or check cashing functions) in Chicago, Illinois and the metropolitan Chicago area in northern Illinois. In addition, during this period, Superior Insurance and Financial Services ("SIFS"), a wholly-owned operating sub-

sidiary of Superior, offered insurance services through Superior's offices in Illinois.

From December 1992 until July 27, 2001, Superior, through its Alliance Funding division, also maintained offices for mortgage banking and consumer finance operations in Montvale, New Jersey until approximately July of 1998, when those operations moved to Orangeburg, New York. During this same period, Superior's mortgage lending operation expanded to loan production offices in a number of states other than Illinois and New York. In addition to its offices in Illinois and New York, immediately before Superior was closed on July 27, 2001, it had fifteen loan production offices in twelve states other than Illinois and New York.

According to the following findings of the Office of Inspector General, FDIC in Audit Report No. 02–005, issued February 6, 2002:

**The bank was dominated by one individual—the Chairman of the Board of Directors.**

Although Superior's retail operation was located in the Chicago area, the Chairman worked in New York and was instrumental in developing and coordinating Superior's principal lines of business. He often asserted to OTS management and examiners that Superior's ownership would always stand behind Superior in the event it ran into financial problems. According to OTS examiners, he was a very persuasive person who knew the most about Superior's operations. Reportedly, the Chairman pursued courses of action contrary to OTS positions. For example, during the October 2000 OTS field visit, the Chairman disagreed with regulators on accounting issues related to the valuation of certain residual assets. The Chairman adamantly supported Superior's accounting methodologies as properly applying Generally Accepted Accounting Principles (GAAP), and sanctioned overall business strategies that clearly ignored any avenues to diversify Superior's high-risk and volatile asset base. Subsequently, he resigned in January 2001 in the face of overwhelming evidence that Superior's accounting methodologies were flawed.

Superior's charter—the Federal Stock Charter issued to Lyons Savings Bank—states that its "home office shall be located at 440 East Ogden Avenue in Hinsdale, Illinois." Superior prepared its mandatory periodic Thrift Financial Reports at its headquarters in Illinois, and filed them with OTS using Superior's headquarters address in Illinois. OTS's examination and regulation of Superior was conducted by its Chicago, Illinois Regional Office. OTS Orders and other official communications from OTS to Superior were sent to Superior's corporate headquarters address in Illinois. Superior's United States and Illinois state tax returns likewise indicated Superior's headquarters' address as being in Illinois.

OTS Order No. Chi–01–01, dated February 14, 2001, and OTS Order No. Chi–01–04, dated May 24, 2001, both of which are Prompt Corrective Action Directives addressed to Superior and issued by Superior's primary federal regulator, refer to Superior as "Superior Bank, FSB, Oakbrook Terrace, Illinois." In Sections 3.4 and 4.4 respectively, both of those Orders state that any document or notice provided or permitted to be served under the Order shall be addressed to Superior as follows: "Superior Bank FSB, Attention: Board of Directors, 1 Lincoln Centre, Suite 600, Oakbrook Terrace, IL 60181."

The majority of Superior's permanent corporate records—such as its Board of Directors' Meeting Minutes, personnel records, and company-wide financial rec-

ords—were maintained in its corporate headquarters in Illinois.

Most of Superior's Board of Directors' meetings were held in Illinois. From January 1996 through July 27, 2001, twenty-four of Superior's Board of Directors' meetings were held in Illinois, four were held in New York, and two were held in New Jersey.

Superior's Human Resource Department, its payroll activities and accounting and administrative services were all headquartered in Illinois. Other than operations related to Alliance Funding, Superior's Alliance Funding division did not control, direct or manage any part of Superior's business operations from its offices in New York.

Neal T. Halleran ("Halleran") was president and chief executive officer of Superior from January 1, 1993 until OTS closed Superior on July 27, 2001, and a director of Superior from January 1993 until July 27, 2001. Halleran's office was in Illinois, and he worked in Illinois. On a few occasions, Halleran traveled to New York to meet with Superior's Board of Directors—although Superior's board meetings normally were held in Illinois. Also, on a few occasions, Halleran traveled to New York to meet with Nelson Stevenson, the former chairman of the board of Superior, and Monte Kurs, a senior vice president of Superior and president of Superior's Alliance Funding division.

### The Standard to be Applied

In addressing the present motion, the Court is mindful that the plaintiffs are proceeding *pro se* and that their submissions should be held " 'to less stringent standards than formal pleadings drafted by lawyers....' " *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *see also Fer-*

*ran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993). Indeed, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, the Court is also aware that *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (quotations omitted).

■ A court must decide a Rule 12(b)(1) motion before other motions to dismiss. *See Circle Industries v. City Federal Savings Bank,* 749 F.Supp. 447, 449 (E.D.N.Y. 1990) (citing *Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n,* 896 F.2d 674, 678 (2d Cir.)) ("[w]here ... the defendant moves for dismissal under Rule 12(b)(1), Fed.R.Civ.P., as well as on other grounds, 'the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined' ") (quotation omitted), *aff'd,* 931 F.2d 7 (2d Cir.1991) (per curiam).

■ Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient. *See Peterson v. Continental Airlines, Inc.,* 970 F.Supp. 246 (S.D.N.Y.1997). Once challenged, the burden of establishing jurisdiction rests with the party asserting that it exists. *See Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942). The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence,

that the court has subject matter jurisdiction. *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996); *Gallo v. United States,* 950 F.Supp. 1246, 1248 (S.D.N.Y.1997) (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994)).

■ On a motion to dismiss for lack of subject matter jurisdiction, the court may resolve disputed jurisdictional factual issues by reference to evidence outside the pleadings. *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *see also Cauthorne v. Mutual Life Ins. Co. of New York,* No. 96 Civ. 0232, 1997 WL 154019, at *2 (S.D.N.Y. Apr. 1, 1997). The court may decide the matter on the basis of affidavits or other evidence, and "no presumptive truthfulness attaches to the complaint's jurisdictional allegations." *Guadagno v. Wallack Ader Levithan Assoc.,* 932 F.Supp. 94, 95 (S.D.N.Y.1996); *accord Integrated Utils. Inc. v. United States,* No. 96 Civ. 8983, 1997 WL 529007, at *3 (S.D.N.Y. Aug.26, 1997) (" 'argumentative inferences favorable to the party asserting jurisdiction should not be drawn' ") (quoting *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992)).

### Subject Matter Jurisdiction is Lacking

1. ***Jurisdiction Exists only in the District in which the Failed Bank's Principal Place of Business is Located and the United States District Court for the District of Columbia***

■ The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), set forth the regulatory and receivership powers and duties of the federal banking agencies. *See* 12 U.S.C. § 1821(d). One of the powers provided to the receiver in FIRREA was the power to determine claims and to disallow claims not proven to the receiver's satisfaction. *See* 12 U.S.C. §§ 1821(d)(3)(A) and (d)(5)(D). A fundamental requirement of the statutory claims procedures created by FIRREA is that all claimants against the institution must file their claims with the receiver. 12 U.S.C. § 1821(d)(5). If a claimant is dissatisfied with the receiver's determination of its claim, the claimant may seek *de novo* adjudication in the appropriate federal district court.

Section 1821(d)(13)(D) bars the jurisdiction of all courts over claims against the failed bank unless jurisdiction is otherwise authorized in section 1821(d).[1] Section 1821(d)(13)(D) provides as follows:

(d) Limitation on judicial review

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver.

The only jurisdiction "otherwise provided" in 12 U.S.C. § 1821(d) is contained in section 1821(d)(6)(A), which provides for federal court adjudication of claims after exhaustion of the claims procedures. 12

---

1. *See, e.g., Meliezer v. RTC,* 952 F.2d 879, 882 (5th Cir.1992) ("Section 1821(d)(13)(D) operates to divest the courts of jurisdiction"); *RTC v. Mustang Partners,* 946 F.2d 103 (10th Cir. 1991); *RTC v. Elman,* 949 F.2d 624, 627 (2d Cir.1991); *FDIC v. Shain, Schaffer & Rafanello,* 944 F.2d 129, 136 (3d Cir.1991); *Rosa v. RTC,* 938 F.2d 383 (3d Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991).

U.S.C. §§ 1821(d)(6)(A) and 1821(d)(8)(C); *see also Meliezer v. RTC,* 952 F.2d at 882. Section 1821(d)(6)(A) expressly limits jurisdiction to the federal courts because it specifies that, after disallowance of a claim by the receiver:

> the claimant may ... file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial. court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

12 U.S.C. § 1821(d)(6)(A). Section 1821(d)(6)(B) then confirms that the federal courts granted jurisdiction by § 1821(d)(6)(A) are the only avenues to seek the prescribed *de novo* judicial adjudication because section 1821(d)(6)(B) eliminates all further remedies if litigation is not continued in the federal forum under section 1821(d)(6)(A). *See Mustang Partners,* 946 F.2d at 106; *Capital Data Corp. v. Capital Nat'l Bank,* 778 F.Supp. 669, 674 (S.D.N.Y.1991).

In *Resolution Trust Corporation, as Receiver for Columbia Banking Federal Savings and Loan Association v. J.F. Associates,* 813 F.Supp. 951 (N.D.N.Y.1993), when determining whether the Northern District of New York would have subject-matter jurisdiction over the counterclaims involved in the action after the administrative review process was exhausted, the court said:

> This analysis necessarily begins with a review of the two most pertinent statutory provisions of FIRREA—12 U.S.C. §§ 1821(d)(13)(D) and 1821(d)(6)(A). Under § 1821(d)(13)(3), the jurisdictional capacity of the federal courts with regard to claims against the assets of failed depository institutions is barred

except as expressly provided for in the various subsections of . § 1821(d). Section 1821(d)(6)(A) is one such grant of jurisdiction. Thereunder, the federal courts are given jurisdiction to adjudicate matters seeking assets from a failed depository institution once RTC is appointed receiver provided the dictates of § 1821(d)(6)(A) are complied with ... A cursory reading . of § 1821(d)(6)(A) appears to indicate that this jurisdiction is limited to one of two district courts—the District of Columbia or the district court in which the failed depository institution's principal place of business is located. Thus, the combination of § 1821(d)(13)(D) (barring jurisdiction) and § 1821(d)(6)(A) (expressing limited jurisdiction) seemingly precludes further analysis in the instant case.

*Id.* at 954. Similar findings have been made by courts in other districts. In *Mansolillo v. Federal Deposit Insurance Corporation, as Receiver for Capital Bank and Trust Co.,* 804 F.Supp. 426, 428 (D.R.I.1992), the court stated:

> The Court agrees with the FDIC that the choice of forum provision in 12 U.S.C. § 1821(d)(6)(A) is jurisdictional. This conclusion is inescapable given the language of FIRREA. Section 1821(d)(13)(D) clearly states that "[e]x-.cept as otherwise provided in this sub-.section, no court shall have jurisdiction over ... any claim ..." Section 1821(d)(6)(A) states that a claimant may file suit in the district court "within which the depository institution's place of business is located or the United States District Court for the District of Columbia" (and such court shall have jurisdiction to hear such claim).

The cases indicate that jurisdiction over these actions is limited to the precise parameters of the statute. *See also Federal Deposit Insurance Corporation v. The Sat-*

*ter Companies,* 791 F.Supp. 26, 28 (D.Me. 1992) (Court would have no subject-matter jurisdiction over counterclaim in light of 12 U.S.C. § 1821(d)(6)(A) where failed bank's principal place of business is located in New Hampshire, not Maine).

## 2. The Amended Complaint Sets Forth Claims Against a Failed Bank in FDIC Receivership

The caption of Plaintiff's amended complaint names as the only defendant, "Federal Deposit Insurance Corporation, as Receiver for SUPERIOR BANK FSB." Plaintiffs' claims are claims based on alleged acts or omissions of the FDIC in its "receiver" capacity. Amended Complaint, ¶¶ 4, *et seq.* Therefore, pursuant to 12 U.S.C. § 1821(d)(6)(A), a judicial determination of a claim against the FDIC as receiver for Superior can be obtained only in the U.S. District Court for the District of Columbia or the U.S. District Court for the district within which Superior's principal place of business is located.

## 3. Superior's Principal Place of Business is in the Northern District of Illinois

■ In determining where Superior's principal place of business is located, the court must first address the threshold issue of whether Superior is an active, going concern or has ceased business activity. Although the citizenship of the parties to a lawsuit is normally determined as of the time the action is commenced, *see Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); *Krauth v. Executive Telecard, Ltd.,* 887 F.Supp. 641, 646 (S.D.N.Y.1995), when a corporation has ceased business activity, its principal place of business is determined by the place in which it last transacted business. *See Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.,* 101 F.3d 900, 907 (2d Cir.1996); *Wm. Passalacqua Builders,*

*Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 141 (2d Cir.1991). On July 27, 2001, the OTS, which was then Superior's primary regulator, placed Superior into receivership and appointed the FDIC as receiver. Plaintiffs' Amended Complaint, ¶¶ 3, 24, 25. Therefore, Superior must be treated as an entity that has ceased business activity and its principal place of business determined as of the date on which it last transacted business, July 27, 2001.

■ Courts in the Second Circuit recognize two different tests for determining the principal place of business of a corporation. The choice of which test to apply depends on the structure and nature of the corporation. *See Krauth,* 887 F.Supp. at 646. Where a corporation's activities are decentralized and spread across numerous states, courts apply what is known as the "nerve center" test to determine a corporation's principal place of business. Under that test, courts focus on those factors that identify the place where the corporation's overall policy originates. *See R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979); *Refco Properties, Inc. v. Trump,* No. 94 Civ. 2124, 1995 WL 412423, at *2 (S.D.N.Y. July 12, 1995); *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959) ("Where a corporation is engaged in farflung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective."). In other words, the "nerve center" test places the principal place of business at the location of the corporation's headquarters. *See Compucon Distrib. of New England, Inc. v. Cooper,* 685 F.Supp. 424, 425 (S.D.N.Y.1988).

In contrast, where corporations are centralized, courts apply the "place of operations" or "locus of operations" test to determine a corporation's principal place of business. A corporation's principal place of business under this test is the location in which the corporation has its most extensive contacts with, or its greatest impact on, the general public. *See R.G. Barry,* 612 F.2d at 655; *Krauth,* 887 F.Supp. at 647; *Center for Radio Information, Inc. v. Herbst,* 876 F.Supp. 523, 525 (S.D.N.Y.1995).

Here, Superior was a federally chartered savings association that conducted its operations on a nationwide basis with eighteen offices located in the metropolitan Chicago area in northern Illinois, and sixteen offices in twelve states other than Illinois, including one office in New York.

Under the "nerve center" test, Superior's nerve center was its Oakbrook Terrace, Illinois corporate headquarters office. Superior's president and chief executive officer had his offices in Oakbrook Terrace, Illinois and no meaningful part of his employment activities with Superior was conducted in New York. Superior's charter—the Federal Stock Charter issued to Lyons Savings Bank—states that its "home office shall be located at 440 East Ogden Avenue in Hinsdale, Illinois." Superior prepared its mandatory periodic Thrift Financial Reports at its headquarters in Illinois, and filed them with OTS using Superior's headquarters address in Illinois. OTS's examination and regulation of Superior was conducted by its Chicago, Illinois Regional Office. OTS orders and other official communications from OTS to Superior were sent to Superior's corporate headquarters address in Illinois. Superior's United States and Illinois state tax returns likewise indicated Superior's headquarters address

as being in Illinois. The majority of Superior's permanent corporate records—such as its board of directors meeting minutes, personnel records, and company-wide financial records—were maintained in its corporate headquarters in Illinois. The great majority of Superior's board of directors meetings were held in Illinois. Key corporate departments were located in Illinois: Superior's Human Resource Department, its payroll activities and accounting and administrative services were all headquartered in Illinois.

According to Halleran, the majority of Superior's general policies and procedures, including some that applied to Alliance Funding, were formulated at Superior's corporate headquarters in Illinois. *Id.* Other than operations related to Alliance Funding, Superior's Alliance Funding Division did not control, direct or manage any part of Superior's business operations from its offices in New York.

In the related *Coast–To–Coast* case, the Plaintiffs averred, "Upon information and belief, non-party Superior is a federal savings bank with its principal place of business in the State of Illinois." In their original complaint filed in the instant case on June 10, 2002, the Plaintiffs averred, however, "Venue in this district is proper pursuant to 12 U.S.C. § 1821(d)(6) as Superior's principal place of business was located in New York through its mortgage banking and consumer finance division, Alliance Funding." In *Peters v. Timespan Communications, Inc.,* 97 Civ. 8750, 1999 WL 135231 (S.D.N.Y. March 12, 1999), a decision involving the location of a corporation's principal place of business for diversity jurisdiction purposes, the Honorable Denny Chin noted with disapproval that a party had made similar conflicting allegations in pleadings in termination of jurisdiction, stating, "Timespan's claim that its

principal place of business was California is particularly disingenuous given that it has taken inconsistent positions with respect to this issue in the past ... While not controlling, the above evidence [the previous inconsistent position] is entitled to considerable weight." *Id.* at *7 n. 3.

The Plaintiffs' entire argument regarding Superior's principal place of business is premised upon the conduct and principal location of one individual, the chairman of Superior's board of directors, who resigned from Superior's board in January 2001. Because Superior's principal place of business must be determined as of the date on which it last transacted business, July 27, 2001, accepting Report No. 02–005 as quoted by the Plaintiffs, states nothing about Superior on July 27, 2001, the date relevant to the FDIC–Receiver's motion to dismiss for lack of subject matter jurisdiction.

It is not controverted that Superior, which had its home office and corporate headquarters and seventeen other banking offices in Illinois and sixteen offices in thirteen other states, including New York, was a decentralized entity. The Plaintiffs have not argued that Superior's principal place of business is to be determined by using anything other than the "nerve center" test.

Application of the appropriate test for determining Superior's principal place of business establishes that because Superior's nerve center was its Oakbrook Terrace, Illinois corporate headquarters office, its principal place of business was not in the U.S. District Court for the Southern District of New York. Accordingly, under FIRREA, 12 U.S.C. § 1821(d), this Court lacks subject matter jurisdiction over the claims asserted in Plaintiffs amended complaint.

For the reasons set forth above, this action is dismissed pursuant to Fed. R.Civ.P. 12(b)(1) for lack of jurisdiction over the subject matter.

It is so ordered.