Liranzo v. United States

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 30, 2012          Decided: August 9, 2012)

Docket No. 11-61

------------------------------------

VITERBO LIRANZO, AKA VITERBO IGNACIO LIRANZO DICENT,

Plaintiff-Appellant,

- v -

UNITED STATES OF AMERICA,

Defendant-Appellee.

------------------------------------

Before:   SACK, RAGGI, and CHIN, Circuit Judges.

Appeal by the plaintiff from a judgment of the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, Judge) dismissing for lack of subject matter jurisdiction the plaintiff's claims relating to his mistaken detention as a removable resident alien. The district court concluded that subject matter jurisdiction was lacking over the plaintiff's Federal Tort Claims Act claims because there was no private analogue to the immigration detention suffered by the plaintiff, as required to find a waiver of the United States' sovereign immunity under the Act. Because we conclude that there

is such an analogue, we vacate the judgment of the district court in part and remand for further proceedings.  We affirm the district court's judgment insofar as it dismissed the plaintiff's Fourth Amendment claim, which he does not challenge on appeal.

Affirmed in part, reversed in part, and remanded.

LAWRENCE K. KATZ, Katz & Kreinces LLP, Mineola, NY, for Plaintiff-Appellant.

JAMES H. KNAPP (Margaret M. Kolbe, Varuni Nelson, on the brief), Assistant United States Attorneys, of counsel, for Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Defendant-Appellee.

SACK, Circuit Judge:

In March 2006, plaintiff Viterbo Liranzo, a United States citizen, completed a term of incarceration in New York State prison for felony possession of a controlled substance. Before his release, United States Immigration and Customs Enforcement ("ICE") erroneously identified him as a permanent resident alien who had been convicted of a felony, which rendered him subject to removal.[1]  He was released to the custody of ICE

---

[1]
In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009-546. . . .
. . . .
Before IIRIRA's passage, United States immigration law established "two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings."  Exclusion hearings were held for certain aliens seeking

2

and transported to a detention center in Louisiana pending removal. During removal proceedings in Louisiana, it was discovered that Liranzo is a U.S. citizen, and he was therefore released.

Thereafter, Liranzo brought the instant complaint in the United States District Court for the Eastern District of New York against the United States under the Federal Tort Claims Act ("FTCA" or the "Act") alleging, inter alia, that federal immigration officials had falsely arrested and imprisoned him. Following some two years of discovery, the matter was set for trial. But before trial began, the district court (Sandra J. Feuerstein, Judge) granted the government's motion to dismiss the case for lack of subject matter jurisdiction because, the court concluded, there was no private analogue to the immigration detention suffered by plaintiff, as required for the Act to have

entry to the United States, and deportation hearings were held for certain aliens who had already entered this country. . . .
. . . .
In IIRIRA, Congress abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as "removal." See 8 U.S.C. §§ 1229, 1229a.

Vartelas v. Holder, 132 S. Ct. 1479, 1483-84 (2012) (citations omitted). In this opinion we therefore use the term "removal" instead of "deportation." We have not, however, changed the term "deportation" in quotations of the district court or of either party.

3

worked a waiver of the United States' sovereign immunity from suit.

Inasmuch as we conclude that there is such an analogue, we reverse and remand for further proceedings.  We affirm the district court's judgment insofar as it dismissed the plaintiff's Fourth Amendment claim, which he does not challenge on appeal.

**BACKGROUND**[2]

<u>Liranzo's Citizenship</u>

Plaintiff Viterbo Liranzo was born on May 10, 1955, in the Dominican Republic.  He entered the United States as a lawful permanent resident in 1965 when he was ten years old.  On February 24, 1972, pursuant to a Dominican divorce decree, the plaintiff's mother, Augustina Dicent, was awarded custody of Liranzo.  On October 6, 1972, when Liranzo was sixteen years old, his mother became a naturalized U.S. citizen.  Because he was a lawful permanent resident in his mother's custody when she was naturalized, and he was younger than eighteen years old at the time, Liranzo obtained derivative citizenship on that date under the immigration laws then in force.  <u>See</u> Immigration and Nationality Act ("INA") § 321(a)(3), 8 U.S.C. § 1432(a)(3)

---

[2]  The material facts relevant to the issue on appeal are not in dispute.  The facts are drawn from the record in the district court, the parties' representations before this Court, and the parties' pre-trial statement of stipulated facts.  <u>See</u> Am. Proposed Pre-Trial Order at 1-3, <u>Liranzo v. United States</u>, No. 08 Civ 2940 (SJF)(ARL) (E.D.N.Y. July 8, 2010), ECF No. 31.

4

(repealed 2000) (providing for derivative citizenship upon, inter alia, the "naturalization of the parent having legal custody of the child when there has been a legal separation of the parents").

Derivative citizenship under section 321 of the INA was "automatic; that is, when certain conditions exist[ed], a child bec[ame] a U.S. citizen even though neither parent, nor the child, ha[d] requested it." Lewis v. Gonzales, 481 F.3d 125, 131 (2d Cir. 2007) (per curiam). Nonetheless, under that regime, the government did not issue a certificate of naturalization to children who obtained derivative citizenship until such a certificate was sought by the child or a parent.[3] See 8 C.F.R. § 320.3. Thus, apparently because Liranzo did not know he had become a citizen, he continued to renew his "resident alien card" (or "green card") until the mid-1990s. Liranzo's last green card was effective through June 10, 2006. As a result of the renewals, at the time of the events in question, federal immigration records erroneously listed Liranzo as a lawful permanent resident rather than as a citizen.

---

[3] After the events in question, on May 15, 2007, Liranzo obtained a certificate of citizenship. The government does not dispute that Liranzo obtained derivative citizenship on October 6, 1972.

5

<u>Liranzo's New York State Conviction</u>
<u>and Subsequent Immigration Detention</u>

In approximately September 2005, Liranzo was convicted of criminal sale of a controlled substance in the fourth degree in violation of New York Penal Law section 220.34 for selling cocaine. He was incarcerated at the Nassau County Correctional Center ("NCCC") in East Meadow, New York. His term of incarceration was scheduled to end on or about March 17, 2006.

While Liranzo was serving his sentence, ICE agents identified him as a resident alien convicted of a drug felony through ICE's Criminal Alien Program.[4] ICE issued an immigration detainer to NCCC officials requesting that they release Liranzo only into ICE's custody so that he could be removed from the United States. <u>See generally</u> 8 C.F.R. § 287.7(a) (describing the nature and purpose of immigration detainers). Because of the detainer, Liranzo was held at the NCCC for approximately seven days beyond his projected release date.

_____

[4] Pursuant to the Criminal Alien Program, ICE attempts to identify removable "aliens who are incarcerated within federal, state and local prisons and jails" so that it can "process[] the alien expeditiously and secur[e] a final order of removal for an incarcerated alien[, ideally] before the alien is released to ICE custody." <u>Criminal Alien Program</u>, ICE, http://www.ice.gov/criminal-alien-program/ (last visited July 18, 2012). By identifying removable incarcerated aliens before their release from prison, ICE endeavors to "decrease[] or eliminate[] the time spent in ICE custody [prior to the alien's removal] and reduce[] the overall cost to the federal government." <u>Id.</u>

According to Liranzo, he was interviewed by an ICE representative at the prison. Liranzo asserts that he told the ICE representative that he, Liranzo, was a United States Citizen. Liranzo also alleges that his sister spoke to another ICE representative and provided the representative with Liranzo's mother's naturalization papers.

On or about March 24, 2006, ICE took Liranzo into custody. ICE also served him with a Notice to Appear for removal proceedings, charging him as a removable alien who had committed an aggravated felony. He was first held in an ICE detention facility in Manhattan for some 23 hours, then taken to a facility in Freehold, New Jersey, where he was held for another seven days. Thereafter, he was transported to the Federal Detention Center at Oakdale, Louisiana.

Liranzo's removal proceedings, during which he was represented by counsel, began in Oakdale. On May 3, 2006, the proceedings were adjourned to allow Liranzo's attorney to gather documents for the purpose of substantiating Liranzo's claim to citizenship. On or about May 21, 2006, his attorney filed a motion to terminate the proceedings supported by Liranzo's birth certificate and his mother's naturalization certificate and divorce decree.

Thereafter, government officials investigated the validity of Liranzo's mother's divorce decree and her award of

7

custody of Liranzo to determine whether he would have met the applicable requirements for derivative citizenship. These issues were determined in Liranzo's favor on or about June 21, 2006.

On June 30, 2006, ICE released Liranzo. He was taken to a bus terminal in Louisiana, where he arranged for his own transportation back to New York City. With ICE's consent, removal proceedings were formally terminated on or about July 20, 2006.

District Court Proceedings

After exhausting his administrative remedies by filing a claim with the Department of Homeland Security, Liranzo filed the instant complaint in the United States District Court for the Eastern District of New York against the United States on July 18, 2008. He sought five million dollars in damages for "false arrest and imprisonment" and other torts allegedly committed by government officials in connection with his immigration detention. On February 6, 2009, the United States answered the complaint, elliptically asserting as one of its defenses that Liranzo's claims were "subject to, and limited by," the FTCA. Am. Answer at 4, Liranzo v. United States, No. 08 Civ. 2940 (SJF)(ARL) (E.D.N.Y. Feb. 6, 2009), ECF No. 9. After nearly two years of discovery, a bench trial was scheduled to begin on

8

December 13, 2010.[5] No motion to dismiss was made, and no motions for summary judgment were made by either party.

Federal Rule of Civil Procedure 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3); see also Weinstein v. Iran, 609 F.3d 43, 47 (2d Cir. 2010) ("[S]ubject matter jurisdiction may be raised at any point . . . ."), cert. denied, --- S. Ct. ----, No. 10-947, 2012 WL 2368690, 2012 U.S. LEXIS 4760 (June 25, 2012). On December 8, 2010, just five days before the scheduled start of the bench trial, the government submitted a letter motion seeking dismissal of the complaint for lack of subject matter jurisdiction. The government premised its motion on the defendant's sovereign immunity from suit based on the limited nature of the FTCA's waiver of that sovereign immunity. See Wake v. United States, 89 F.3d 53, 57 (2d Cir. 1996) ("Absent a waiver, sovereign immunity shields the federal Government and its agencies from suit. Thus, sovereign immunity is jurisdictional in nature.") (ellipsis, brackets, and internal quotation marks omitted). The waiver extends only to claims for which a private analogue exists -- that is, the waiver extends only to claims that could be brought against a "private individual under like

_____

[5] With exceptions not relevant here, jury trials are not available to plaintiffs bringing claims against the United States under the FTCA. See 28 U.S.C. § 2402.

9

circumstances," 28 U.S.C. § 2674 -- permitting the government to be held liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," id. § 1346(b)(1).

The government's "chief legal argument" was that there was no private analogue to immigration detentions because "citizenship determinations and immigration matters are federal functions reserved to the federal government, and, . . . because a private individual cannot engage in such determinations, the United States has not waived sovereign immunity on claims related thereto." Def.'s Reply Letter Br. at 1, Liranzo v. United States, No. 08 Civ. 2940 (SJF)(ARL) (E.D.N.Y. Dec. 14, 2010), ECF No. 38 ("Def.'s Reply Letter Br.") (emphasis in original).

Although the government acknowledged that the FTCA explicitly permits claims for false imprisonment to be brought against the United States based on the acts of federal law enforcement agents, see 28 U.S.C. § 2680(h) (waiving sovereign immunity for claims against "investigative or law enforcement officers of the United States Government . . . arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution"), the government urged the district court to "look beyond the labels attached by Plaintiff to his claims." Def.'s Letter Br. at 3, Liranzo v. United

10

States, No. 08 Civ. 2940 (SJF)(ARL) (E.D.N.Y. Dec. 8, 2010), ECF No. 35 ("Def.'s Letter Br."). According to the government, despite the label, Liranzo's claims "arise[] from the ICE agents' alleged negligent/erroneous citizenship determination of Plaintiff and their resultant attempts to apply federal immigration statutes to effectuate his deportation." Id. Further, the government asserts, Liranzo "attempt[ed] to cloth[e] 'federal function tort claims' (over which the United States has not waived sovereign immunity) in 'law enforcement intentional tort' garb (over which the United States has waived sovereign immunity)." Def.'s Reply Letter Br. at 2.

Liranzo responded that "[h]ad a private individual held plaintiff prisoner for 105 days, New York would allow plaintiff to recover." Pl.'s Letter Br. at 1-2, Liranzo v. United States, No. 08 Civ. 2940 (SJF)(ARL) (E.D.N.Y. Dec. 9, 2010), ECF No. 36. Therefore, Liranzo argued, a private analogue to the claims asserted in the complaint existed.

By memorandum and order dated December 15, 2010, the district court dismissed the action for lack of subject matter jurisdiction pursuant to Rule 12(h)(3). It reasoned that "[i]mmigration and detention pending deportation are governed exclusively by federal law and therefore have no private analogue." Mem. & Order at 9, Liranzo v. United States, No. 08 Civ. 2940 (SJF)(ARL) (E.D.N.Y. Dec. 15, 2010), ECF. No. 41 ("Mem.

11

& Order").  It also read this Court's precedents, including <u>Caban v. United States</u>, 671 F.2d 1230 (2d Cir. 1982) ("<u>Caban I</u>"), and <u>Caban v. United States</u>, 728 F.2d 68 (2d Cir. 1984) ("<u>Caban II</u>"), as indicating that for FTCA purposes, there is no private analogue for federal immigration detentions.  It concluded that, "[a]s plaintiff's intentional tort claims are based upon the detention of plaintiff pending deportation proceedings and the process the immigration agents used to determine his citizenship status, plaintiff has not established that a comparable cause of action would exist against a private individual pursuant to New York State law."  Mem. & Order at 10.

Liranzo appealed from the judgment of dismissal.

## DISCUSSION

When reviewing the dismissal of a complaint for lack of subject matter jurisdiction, we review factual findings for clear error and legal conclusions <u>de novo</u>, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor.  <u>Morrison v. Nat'l Austl. Bank Ltd.</u>, 547 F.3d 167, 170 (2d Cir. 2008), <u>aff'd on other grounds</u>, 130 S. Ct. 2869 (2010).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  <u>Aurecchione v. Schoolman Transp. Sys., Inc.</u>, 426 F.3d 635, 638 (2d Cir. 2005).  The United States' waiver of immunity under the FTCA "is to be strictly construed in favor of the

12

government."  Long Island Radio Co. v. NLRB, 841 F.2d 474, 477 (2d Cir. 1988).

### I. The FTCA's Private Analogue Requirement

"'The United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)) (brackets omitted).[6]  In 1946, Congress enacted the Federal Tort Claims Act, which "constitutes a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances."[7]

---

[6]  The United States' sovereign immunity from suit is ultimately derived from English common law.  "While the political theory that the King could do no wrong was repudiated in America, a legal doctrine derived from it that the Crown is immune from any suit to which it has not consented was invoked on behalf of the Republic and applied by our courts as vigorously as it had been on behalf of the Crown."  Feres v. United States, 340 U.S. 135, 139 (1950) (footnote omitted).

[7]  Prior to the passage of the FTCA in 1946, if a private individual was injured by a federal employee, he could only seek relief from the federal government by petitioning Congress to pass a "private bill" compensating him for his injuries.

> Relief was often sought and sometimes granted through private bills in Congress, the number of which steadily increased as Government activity increased.  The volume of these private bills, the inadequacy of congressional machinery for determination of facts, the importunities to which claimants subjected members of Congress, and the capricious results, led to [the passage of

13

_Hamm v. United States_, 483 F.3d 135, 137 (2d Cir. 2007)

(quotation marks omitted).  The FTCA provides jurisdiction in the

federal courts and waives the sovereign immunity of the United

States for

> claims against the United States, for money
> damages . . . for . . . injury or loss of
> property, or personal injury or death caused
> by the negligent or wrongful act or omission
> of any employee of the Government while
> acting within the scope of his office or
> employment, under circumstances where the
> United States, if a private person, would be
> liable to the claimant in accordance with the
> law of the place where the act or omission
> occurred.

28 U.S.C. § 1346(b)(1); _see also_ 28 U.S.C. § 2674 ("The United

States shall be liable, respecting the provisions of this title

relating to tort claims, in the same manner and to the same

extent as a private individual under like circumstances.").

As originally enacted, the FTCA barred all suits

against the government "arising out of . . . false

imprisonment[ and] false arrest."  28 U.S.C. § 2680(h) (1970).

But in 1974, Congress enacted amendments to the FTCA principally

---

> the FTCA in 1946, in which the
> government] . . . waived immunity and
> transferred the burden of examining tort
> claims to the courts.

_Feres_, 340 U.S. at 140; _see also_ Erwin Chemerinsky, FEDERAL
JURISDICTION 663 (6th ed. 2012).  The FTCA put an end to the
"notoriously clumsy" "private bill device."  _Dalehite v. United
States_, 346 U.S. 15, 24-25 (1953), _abrogation recognized by
Rayonier Inc. v. United States_, 352 U.S. 315, 319 (1957).

14

in response to abuses committed by federal law enforcement officers in connection with "no-knock" drug raids in Collinsville, Illinois, in which officers raided the wrong families' homes. See generally Stanton R. Gallegos, Note, Are Police People Too?  An Examination of the Federal Tort Claims Act's "Private Person" Standard as it Applies to Federal Law Enforcement Activities, 76 BROOK. L. REV. 775, 780-82 (2011). Under the 1974 amendments, the FTCA explicitly waives sovereign immunity "with regard to acts or omissions of investigative or law enforcement officers of the United States,"[8] for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."[9]  28 U.S.C. § 2680(h).

By waiving sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," id. § 1346(b)(1), the FTCA directs courts to consult state law to determine whether the government

---

[8] "'[I]nvestigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).

[9] The FTCA's jurisdictional provision, 28 U.S.C. § 1346(b), as well as the FTCA's procedural provisions, which include the private analogue requirement set forth in 28 U.S.C § 2674, "apply" to the 1974 amendments' waiver of sovereign immunity for the enumerated intentional torts.  See 28 U.S.C. § 2680(h).

15

is liable for the torts of its employees.  See FDIC v. Meyer, 510 U.S. 471, 478 (1994) ("[The] law of the State [is] the source of substantive liability under the FTCA."); Feres, 340 U.S. at 142 ("This provision recognizes and assimilates into federal law the rules of substantive law of the several states . . . ."). The FTCA does not waive sovereign immunity for claims based solely on alleged violations of federal law.  Meyer, 510 U.S. at 478.

"[T]he Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA [even] in the performance of activities which private persons do not perform."  United States v. Olson, 546 U.S. 43, 46 (2005) (internal quotation marks omitted).  It does not waive sovereign immunity for claims against the government based on governmental "action of the type that private persons could not engage in and hence could not be liable for under local law."  Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotation marks omitted).

The path of the case law on the FTCA's private analogue requirement is long, winding, and sparsely marked.  We therefore think a rehearsal of the history of that case law may be helpful.

A.   The Supreme Court's Private Analogue Jurisprudence

In Feres, one of the Supreme Court's early FTCA cases, the Court considered the private analogue requirement as applied

16

to servicemen injured in active duty "due to negligence of others in the armed forces." 340 U.S. at 138. In the consolidated cases comprising Feres, one plaintiff was killed in an army barracks fire, one plaintiff had a towel left in his abdomen following surgery performed by an Army doctor, and another plaintiff died following surgery performed by Army surgeons, all allegedly resulting from negligence of Army personnel. Id. at 136-37. All three (or their respective estates) sought damages under the FTCA. Id.

In considering whether the FTCA waived the United States' sovereign immunity for the plaintiffs' claims, the Court conceded that "[i]n the usual civilian doctor and patient relationship, there is of course a liability for malpractice. And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant." Id. at 142. But the Court reasoned that such analogies are sound only if one "consider[s] relevant only a part of the circumstances and ignore[s] the status of both the wronged and the wrongdoer." Id. Under the FTCA, "the liability assumed by the Government . . . is that created by 'all the circumstances,' not that which a few of the circumstances might create." Id.

The Feres Court concluded that "there [was no] liability 'under like circumstances,' for no private individual

17

has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command."  Id. at 141-42.

>The relationship between the Government and members of its armed forces is 'distinctively federal in character' . . . .  To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequence of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority.

Id. at 143-44.  Thus, because "the relationship of military personnel to the Government has been governed exclusively by federal law," id. at 146, "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," id.

But just five years later, the Court adopted a broader view of the private analogue requirement, albeit in a non-military context.  In Indian Towing Co. v. United States, 350 U.S. 61 (1955), the plaintiff's tug boat went aground after the battery in a lighthouse operated by the Coast Guard ran out of power.  Id. at 62.  Indian Towing brought a negligence claim against the Coast Guard under the FTCA based on the failure of its employees to maintain the lighthouse in working order.  Id. at 61-62.  The government argued that the private analogue

18

requirement "must be read as excluding liability in the performance of activities which private persons do not perform[,] . . . [i.e.,] 'uniquely governmental functions.'"  Id. at 64.  Because only the Coast Guard operated lighthouses, the government argued that this function was uniquely governmental, and that no private analogue existed.  Id.

The Court rejected the government's proposed test for liability on the ground that "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government."  Id. at 67.  Conversely, "it is hard to think of any governmental activity on the 'operational level,' our present concern, which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed."  Id. at 68.

The Court also observed that the statutory phrase "under like circumstances" does not mean "under the same circumstances."  Id. at 64 (emphases added).  The fact that there were no private lighthouses in operation at the time did not mean that there was no private analogue.

> [I]f the United States were to permit the
> operation of private lighthouses -- not at
> all inconceivable -- the Government's basis
> of differentiation would be gone and the
> negligence charged in this case would be
> actionable.  Yet there would be no change in
> the character of the Government's activity[,]
> . . . and [it is unlikely that Congress
> would] predicat[e] liability on such a

19

completely fortuitous circumstance -- the presence of identical private activity.

Id. at 66-67.

The Court concluded that the relevant private analogue at issue was the duty imposed on the private "good Samaritan": "[O]ne who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." Id. at 64-65. "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate [the] light . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order . . . ." Id. at 69. Because of the existence of this private analogue, "[i]f the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act." Id.

Rayonier Inc. v. United States, 352 U.S. 315 (1957) signaled a further narrowing of the Court's view of Feres's reasoning. There, the plaintiffs alleged that their property was damaged by the United States Forest Service's negligent failure to control a forest fire. Id. at 315-16. The government argued that there was no private analogue because "neither the common law nor the law of [the State of] Washington imposes liability on municipal or other local governments for the negligence of their agents acting in the 'uniquely governmental' capacity of public

20

firemen." Id. at 318-19. The Court rejected the government's argument because the relevant consideration is whether state law would impose liability on a "private person" rather than on a "municipal corporation or other public body" for "similar negligence" as allegedly committed by the government in the case at hand. Id. at 319. In doing so, the Court disapproved of Dalehite v. United States, 346 U.S. 15, 43-44 (1953), which had relied on Feres and the common law "immunity of . . . public bodies for injuries due to fighting fire" to conclude that there was no private analogue to the Coast Guard's firefighting efforts, id. at 44. See Rayonier, 352 U.S. at 319. The Court remanded for consideration of whether state law would hold a private person fighting a fire in similar circumstances liable. Id. at 320-21.

In United States v. Muniz, 374 U.S. 150 (1963), the Supreme Court continued to constrict the reach of the rationales relied upon in Feres. There, the Court considered whether suit could be brought under the FTCA for "personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." Id. at 150. The government argued that Feres defeated a private analogy, because, among other things, "the relationship between the federal prisoner and his custodians" is "uniquely federal in character." Br. for United States, United States v. Muniz, 374 U.S. 150

21

(1963), 1963 WL 105602 at *19. A unanimous Court (Justice White not participating) rejected the government's reliance on <u>Feres</u>. The Court reasoned that "[i]n the last analysis, <u>Feres</u> seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty." <u>Id.</u> at 162 (quotation marks and ellipsis omitted). It concluded that, in the context of the federal prison system, "an analogous form of liability exists. A number of States have allowed prisoners to recover from their jailers [and from the States] for negligently caused injuries."[10] <u>Id.</u> at 159-60.

Most recently, in a brief unanimous opinion in <u>United States v. Olson</u>, 546 U.S. 43 (2005), the Court reaffirmed the principles recognized in <u>Indian Towing</u> and its progeny. The Court vacated a Ninth Circuit decision in which that court (1) had found "no private-sector analogue for mine inspections," the federal activity about which suit had been brought, <u>id</u>. at 45

---

[10] The <u>Muniz</u> Court's decision to look to the liability of jailers and the States that employ them seems to be a departure, or at least a change in emphasis in a new factual context, from <u>Indian Towing</u>'s and <u>Rayonier</u>'s admonition to examine the liability of private individuals under state law when deciding if a private analogue exists, rather than the state law liability of governmental entities. <u>See also</u> <u>infra</u> section II.B (discussing potential analogies to law enforcement and citizen's arrests).

22

(internal quotation marks omitted), but (2) had concluded that because "unique governmental functions" were at issue and relevant state law imposed liability on "state and municipal entities" under the circumstances, the FTCA waived sovereign immunity, id. (internal quotation marks omitted).  The Supreme Court concluded that under its jurisprudence, whether state law imposed such liability on state and municipal entities was irrelevant to the sovereign immunity waiver, id. at 45-46, and that there was indeed a relevant private analogy to the liability of "private persons who conduct safety inspections," id. at 47. The Court remanded the case with instructions to "the lower courts [to] decide . . . in the first instance" "precisely which [State] law doctrine applie[d]."  Id. at 48.

B.  This Court's Private Analogue
     Jurisprudence in Non-immigration Cases

This Court has had several occasions on which to consider the FTCA's private analogue requirement.  In a trilogy of cases decided in the 1980s, we confronted circumstances we concluded were governed exclusively by federal law, were without private analogue, and with respect to which sovereign immunity had therefore not been waived by the FTCA.

In C.P. Chemical Co. v. United States, 810 F.2d 34 (2d Cir. 1987), a producer of formaldehyde-based foam insulation brought suit against the federal government after the Consumer Product Safety Commission announced a ban on the insulation,

23

alleging that the Commission was "gross[ly] negligen[t]" in failing to follow proper rulemaking procedures and disseminating false information about the banned insulation.  Id. at 35-36. The Court began by reviewing the legislative history of the FTCA, which expressed a clear desire that the "constitutionality of legislation, or the legality of a rule or regulation, should [not] be tested through the medium of a damage suit for tort." Id. at 37 (quoting H.R. REP. NO. 79-1287, at 6 (1945)).  The court reasoned that "quasi-legislative or quasi-adjudicative action by an agency of the federal government is action of the type that private persons could not engage in and hence could not be liable for under local law."  Id. at 37-38 (quoting Jayvee Brand v. United States, 721 F.2d 385, 390 (D.C. Cir. 1983)) (quotation marks and brackets omitted).  Because there was "simply no comparable rulemaking activity in private life," we decided that "[t]he Commission's conduct clearly was a quasi-legislative activity for which we find no private counterpart."  Id. at 38.

In Chen, a printing company brought FTCA claims against the government based on the General Services Administrations's attempt to suspend and debar the company as a federal contractor.  854 F.2d at 623.  Most of the plaintiff's claims were "grounded in alleged negligent and willful violations of federal procurement regulations, specifically, those requiring that a contractor receive notice and a hearing prior to any suspension."

24

_Id._ at 626. We concluded that "violation of the government's duties under federal procurement regulations 'is action of the type that private persons could not engage in and hence could not be liable for under local law.'" _Id._ at 626 (quoting _Jayvee Brand_, 721 F.2d at 390). We contrasted Chen's claims with those in _Birnbaum v. United States_, 588 F.2d 319, 326 (2d Cir. 1978), in which we observed that the "opening and reading of sealed mail by [the Central Intelligence Agency], just as if by [a] private party, violates [the] common-law right of privacy."[11] _Chen_, 854 F.2d at 626. We also rejected Chen's proposed private analogue, "wrongful sanctions by private associations against individual members," _id._, because no such tort liability existed under New York law. _Id._ at 626-27.

And in _Akutowicz v. United States_, 859 F.2d 1122 (2d Cir. 1988), the plaintiff brought claims against the government when the State Department decided that he had relinquished his United States citizenship after obtaining French citizenship. _Id._ at 1123-25. We noted that "the FTCA does not extend to conduct governed exclusively by federal law, or to conduct of a governmental nature or function, that has no analogous liability

---

[11] Though _Birnbuam_ predicted that the New York Court of Appeals would recognize a common law right of privacy, we subsequently acknowledged that our prophesy had been incorrect, and found a failure to state a claim under the "same fact pattern" in _Hurwitz v. United States_, 884 F.2d 684, 685 (2d Cir. 1989), _cert. denied_, 493 U.S. 1056 (1990).

in the law of torts." Id. at 1125 (quotation marks and citations omitted). We decided that although "the FTCA imposes liability upon the government to the same extent, and in the same manner, as a private individual under 'like,' not identical, circumstances," id. at 1125, "the withdrawal of a person's citizenship constitutes a quasi-adjudicative action for which no private analog exists." Id. at 1126. "[N]o private citizen is empowered to certify the loss of American nationality." Id. at 1125. Nor were we willing to "analogize the relationship between the government and its citizens with that between a private association and its individual members," because no "cause of action in tort for alleged misconduct by the association [in improperly expelling one of its members]" existed under state law. Id. at 1126 (quoting Chen, 854 F.2d at 627) (emphasis and quotation marks omitted).

C.  This Court's Treatment of FTCA
     Claims Based on Immigration Detentions

In 1982 and 1984, respectively, we addressed FTCA claims more similar to those at issue on this appeal -- claims based on an allegedly erroneous immigration detention. In Caban I and II, the plaintiff was stopped at John F. Kennedy International Airport upon arrival from the Dominican Republic. Caban I, 671 F.2d at 1230. Illiterate, he was unable to provide documentation to substantiate his claims of United States citizenship, and his answers to the INS officers' questions

26

regarding his past and citizenship status raised their suspicion (e.g., he denied knowing his own birthdate). Caban II, 728 F.2d at 70. INS agents detained him for six days, after which they determined that he was indeed a citizen. Id. Caban brought claims against the United States for false arrest under the FTCA.

In Caban I, this Court concluded that the FTCA's "discretionary function" exception -- which bars FTCA claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty," 28 U.S.C. § 2680(a) -- did not apply to the INS officers' decision to arrest and detain Caban because the decision did not involve the "weighing of important policy choices to which discretion is essential." Caban II, 728 F.2d at 70 (describing Caban I). The court remanded for further proceedings, a bench trial was held, and the district court determined that the complaint should be dismissed because the arrest was privileged under the federal standards applicable to immigration officers, a standard incorporated into New York law through its requirement that a plaintiff suing a private individual for false imprisonment establish that his confinement was "not . . . privileged." Id. at 70-71 (internal quotation marks omitted).[12]

---

[12] See infra section II.B (discussing the circumstances in which an arrest can be privileged under New York law).

In Caban II, we affirmed the judgment of the district court in favor of the government, after trial on remand from Caban I.  Id. at 75.  We first noted that "INS agents are 'investigative or law enforcement officers' within the meaning of [28 U.S.C. § 2680(h)]," the provisions of which waives sovereign immunity for, inter alia, false arrest and imprisonment claims against federal "investigative or law enforcement officers."  728 F.2d at 72.  We then observed that "the reference in § 1346(b)[, the central waiver of immunity provision of the FTCA,] to '[t]he law of the place' means the 'whole law' of the state where the incident took place" -- in that case, the State of New York -- including any federal law that state law incorporated.  Id. (brackets and some quotation marks omitted).  "New York state courts would look to federal principles in determining the standard by which INS officials' detention of a would-be entrant are to be judged."  Id. at 73.  Because "a person seeking entry into the United States has substantially less right to avoid detention than does a person already lawfully within the United States," id., "far less than [the] probable cause" that is ordinarily required to detain a person will suffice to render the detention privileged under the New York law of false imprisonment, which incorporates federal standards, id.[13]

_____

[13]   We use the terms "false arrest" and "false imprisonment" interchangeably.  Under New York law, "the tort of false arrest is synonymous with that of false imprisonment."  Posr v. Doherty,

28

We nonetheless recognized that the FTCA "speaks in terms of the liability, under state law, of 'a private person.'" Id. at 73. While "[a]n authorized government agent would be privileged . . . to act to protect national borders, . . . it is questionable . . . whether New York would extend that privilege to a private person," id., the issue that was before us under section 1346(b).

We reasoned, however, that even if a private person would be held liable under New York State law, the FTCA only provides for liability "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. We then cited Feres for the proposition that "[t]he 'like circumstances' language in [section] 2674 means that 'the liability assumed by the Government . . . is that created by 'all the circumstances,' not that which a few of the circumstances might create.'" Id. at 73-74 (quoting Feres, 340 U.S. at 142).

> [I]mmigration officers are accorded a special status by law which requires them to detain persons in situations also outlined by law. These circumstances are far different from those in which a person who is either thought to have committed a crime or thought to be an alien is detained by a private individual.

Id. at 74 (citing Feres, 340 U.S. at 141-42).

---

944 F.2d 91, 96 (2d Cir. 1991); see also infra note 17 (discussing potentially applicable state law).

29

We concluded that the "interplay among" the "like circumstances" language in section 2647, "the government's privilege to protect the border, and New York's recognition that a privileged detention does not result in liability for false imprisonment" required that "[t]he liability of the government . . . be assessed in light of the liability New York would impose upon one having a privilege to detain a would-be entrant who did not satisfactorily establish his right to enter," that is, in "conformance with the federal standards regarding treatment of applicants for entry to the United States."  Id. at 74 (quotation marks omitted).  We therefore affirmed the district court's ruling that under New York law, the government employees who detained Caban had a "privilege to detain" him under the circumstances at bar, and therefore their employer, the United States, would not be liable for false imprisonment for the privileged behavior.  Id. at 74-75.

Judge Cardamone, concurring in the judgment, questioned the majority's reasoning.  Although he agreed that federal standards applicable to immigration officers should be used to assess liability, he noted the potential for confusion created by the majority's citation to the "like circumstances" language of section 2674 and Feres.  Id. at 76 (Cardamone, J., concurring in the judgment).  Judge Cardamone thought the majority's reliance on Feres was "ill-advised" because "[t]he Feres doctrine plainly

30

does not deal with substantive tort law principles" such as were at issue in Caban II, "but is concerned solely with . . . [the] threshold jurisdictional question" of whether a private analogue exists.  Id.

**II. Analysis**

A.  The Meaning of Caban II

Before the district court, Liranzo relied on Caban II for the proposition that the United States waives its sovereign immunity for FTCA claims arising from immigration detentions. The district court disagreed, deciding that "Caban II does not require an examination of every challenged deportation proceeding to determine whether a plaintiffs claim has a private analogue. Where, as here, the conduct challenged by the plaintiff is exclusively governed by federal law, the FTCA does not waive sovereign immunity."  Mem. & Order at 10.  The district court relied on Caban II's statement that immigration officers are "accorded a special status" "unlike any in which a private individual could be involved," id. at 9 (quoting Caban II, 728 F.2d at 74; internal quotation marks omitted), to find the absence of a private analogue and subject matter jurisdiction over Liranzo's claims.

The reasoning in Caban II is complex.  Perhaps as a result, courts have diverged in their reading of the case.  Some, such as the district court in this case, view Caban II as

31

authority for the proposition that the United States has not waived sovereign immunity for immigration detention claims because there is no relevant private analogue.[14]  This may arise from the Caban II majority's citation to Feres, a case considering only whether a private analogue existed, as authority for judging federal immigration officers' conduct under a federal rather than state standard.  But other courts have -- in our view correctly -- read Caban II as a case about the substantive standard by which immigration officers' acts are to be judged -- not about the presence or absence of a private analogue.[15]  The

---

[14] See also Doe v. United States, 58 F.3d 494, 502 (9th Cir. 1995) (construing Caban II as holding that "immigration officers have materially different duties than do private citizens, and therefore no FTCA liability exists, even if a private person could be liable for wrongfully detaining plaintiff"); Woodbridge Plaza v. Bank of Irvine, 815 F.2d 538, 543 (9th Cir. 1987) (same), superseded by statute on other grounds as stated in Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC, 749 F.Supp. 758, 773 (N.D. Tex. 1990); Lippman v. City of Miami, 622 F. Supp. 2d 1337, 1341 (S.D. Fla. 2008) (same); Schalliol v. Fare, 206 F. Supp. 2d 689, 695 n.24 (E.D. Pa. 2002) (same).

[15] See Rhoden v. United States, 55 F.3d 428, 431 (9th Cir. 1995) (per curiam); Munyua v. United States, No. 03 Civ. 04538 (EDL), 2005 WL 43960, at *4, 2005 U.S. Dist. LEXIS 11499, at *12-*13 (N.D. Cal. Jan. 10, 2005) ("[T]he Caban case does not support the sweeping conclusion that there is no jurisdiction under the FTCA here . . . ."); Nguyen v. United States, No. 00 Civ. 528-R, 2001 WL 637573, at *8-*9, 2001 U.S. Dist. LEXIS 7512, at *26-*28 (N.D. Tex. June 5, 2001) ("Caban indicates that a lawful detention can become unlawful at the point at which the INS's decision to continue the detention is no longer reasonable."), aff'd on other grounds, 65 F. App'x 509 (5th Cir. 2003); Tovar v. United States, No. 98 Civ. 1682, 2000 WL 425170, at *7, 2000 U.S. Dist. LEXIS 5044, at *23-*24 (N.D. Tex. Apr. 18, 2000) (Caban II applied a federal standard to the merits of Caban's claim), aff'd, 244 F.3d 135 (5th Cir. 2000) (unpublished table decision);

Caban II court never even considered the FTCA's private analogue requirement, as that issue was simply not before it on appeal.

If indeed the Caban II court had found the absence of a private analogue to immigration detentions, its inquiry would have been at an end because there would have been no waiver of sovereign immunity, and thus no subject matter jurisdiction over Caban's FTCA claims. Instead, the Caban II court considered the substantive standards under which the immigration officials' conduct was to be judged -- an inquiry that would only be necessary, at least in a case in Caban II's posture, if a private analogue existed. See, e.g., Feres, 340 U.S. at 143-44, 146 (finding that no private analogue existed, and refraining from

Garza v. United States, 881 F. Supp. 1103, 1106 (S.D. Tex. 1995) (describing Caban II as concluding that the "INS officer's detention of [Caban, who was] entering country[, was] privileged under New York law"); Gallegos v. Haggerty, 689 F. Supp. 93, 105 (N.D.N.Y. 1988) (denying the government's motion for summary judgment on the merits of plaintiffs' FTCA claim); Saldana v. United States, No. L-83-46, 1985 WL 5997, at *4 n.2, 1985 U.S. Dist. LEXIS 14091, at *14 n.2 (S.D. Tex. Nov. 7, 1985) ("This Court prefers the conceptual approach in the concurring opinion of Judge Cardamone in Caban [to the question of what standard to apply to the merits of FTCA claims related to immigration detentions] rather than that in the majority opinion of Judge [Kearse], but the result is the same under either approach.").

Another judge of the Eastern District of New York has explicitly disagreed with the district court's reading of Caban II here. Nakamura v. United States, No. 10 Civ. 2797 (FB)(RML), 2012 WL 1605055, at *3, 2012 U.S. Dist. LEXIS 64630, at *8 (E.D.N.Y. May 8, 2012) ("Contrary to the outcome of Liranzo and defendant's arguments, Caban II does not stand for the sweeping proposition that the actions of immigration agents in detaining a person never have a private analogue, and that sovereign immunity is never waived in such cases.").

33

considering the standard to be applied on the merits); see also id. at 141 (stating that generally, "[j]urisdiction is necessary to deny a claim on its merits as matter of law as much as to adjudge that liability exists").  We therefore do not read Caban II as did the district court to indicate that there is no private analogue to immigration detentions.

Moreover, the Caban II Court endorsed the district court's statement in the case before it that "the United States [is] not liable to Caban if the INS agents acted in conformance with the federal standards regarding treatment of applicants for entry to the United States."  Caban II, 728 F.2d at 74 (emphasis added; quotation marks omitted).  That language apparently contemplates a consideration of the facts of a particular immigration detention FTCA claim on the merits, i.e., based on the particulars of the "INS agents['] act[ions]."[16]  Id.

---

[16] Although other courts may have also interpreted Caban II as concerning the FTCA's private analogue requirement, the district court's reliance on Caban II to find a lack of subject matter jurisdiction over an FTCA claim based on an immigration detention is, as far as we can determine, unique.  Cf. Munyua, 2005 WL 43960, at *4, 2005 U.S. Dist. LEXIS 11499, at *11 ("Defendant has cited no case, and the Court has found none, adopting such a sweeping exemption under the FTCA for conduct by immigration officers like that alleged in this case.  To the contrary, courts have exercised jurisdiction over cases brought under the FTCA involving misconduct by immigration officers at the border.").

34

**B.   Whether a Private Analogue Exists in This Case**

The district court concluded that "[i]mmigration and detention pending deportation are governed exclusively by federal law and therefore have no private analogue."  Mem. & Order at 10. Because Liranzo's "intentional tort claims [were] based upon the detention of plaintiff pending deportation proceedings and the process the immigration agents used to determine his citizenship status," the district court found that he had "not established that a comparable cause of action would exist against a private individual pursuant to New York State law."  Id.  Citing Feres, the government similarly argues that "[r]emoval, and the regulation thereof, are federal functions -- in which private citizens cannot engage -- that are exclusively reserved to [the Department of Homeland Security]."  Def.'s Br. 16 (emphasis in original).

To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analogue exists.  Lighthouses, such as the one that was the subject of Indian Towing, were at least at the time operated only by the government.  It was a function that "private persons d[id] not perform."  350 U.S. at 64 (quotation marks omitted).  But "the presence of identical private activity" was not required to find a private analogue, because the FTCA's statutory phrase "under like circumstances" does not mean "under

35

the _same_ circumstances." _Id._ at 64, 67 (emphases added).  Under _Olson_, we are "require[d] . . . to look further afield" for a private analogue when the government in fact is the only entity that performs the actions complained of.  _Olson_, 546 U.S. at 46.

Similarly, the fact that immigration detentions are "uniquely governmental" does not mean they have no private analogue for present purposes.  "[A]ll Government activity is inescapably 'uniquely governmental' in that it is performed by the Government."  _Indian Towing_, 350 U.S. at 67.  This consideration led the _Indian Towing_ Court to reject a construction of the Act under which "there would be no liability for negligent performance of 'uniquely governmental functions,'" _id._ at 64, as such an "exception" to the FTCA's waiver of sovereign immunity would threaten to swallow the waiver entirely.

The Supreme Court has provided us with examples of how to heed its admonition to "look further afield," _Olson_, 546 U.S. at 46, for a private analogue.  In _Indian Towing_ and _Olson_, the proper analogy was that "[p]rivate individuals, who do not operate lighthouses [or inspect mines], nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon[, or a mine inspector and a miner dependent on the inspector faithfully carrying out his duty]."  _Id._ at 47.

Here, the proper analogy seems to us be a person who, entirely in his or her private capacity, places someone under arrest for an alleged violation of the law -- a so-called "citizen's arrest." Such a person may not execute an arrest absent a legal privilege to do so. To successfully establish a claim for false arrest and imprisonment under New York law,[17] a plaintiff must therefore prove that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Caban II, 728 F.2d at 71 (quoting Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 314, cert. denied, 423 U.S. 929 (1975)) (emphasis added); accord Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991). And under Caban II, whether the ICE agents' actions here were "otherwise privileged" is determined by consulting federal privileges

---

[17] For the purposes of this discussion, we assume New York law applies because the initial arrest and detention occurred in New York. We express no opinion as to whether Louisiana law might apply to some portion of Liranzo's claims based on the time he was confined in Louisiana.

37

applicable to federal immigration officers.[18]  Caban II, 728 F.2d at 71.

There is some suggestion in the case law that the proper analogy may be to state law enforcement conducted by police officers instead of a citizen's arrest.  In Muniz, the Court endorsed a private analogy to the liability of states and state jailors.  Muniz, 374 U.S. at 159-60.  And at least one

[18] Following the Supreme Court's statement in Olson that "a court [must] look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA," 546 U.S. at 46, the Court of Appeals for the Ninth Circuit considered whether cases envisioning the application of federal privileges in FTCA suits, such as Caban II, survive Olson.  In Tekle v. United States, 511 F.3d 839 (9th Cir. 2007), a case without a majority opinion as to the FTCA issue, see id. at 850 n.7, Judge Tashima read Olson to require the court to hold the IRS officers at issue to the same standards as a private person executing a citizen's arrest.  Id. at 850-54. In doing so, Judge Tashima called into question a line of Ninth Circuit cases relying on Caban II -- including Arnsberg v. United States, 757 F.2d 971, 978-79 (9th Cir. 1985) and Rhoden, 55 F.3d at 430-31.  Tekle, 511 F.3d at 850-54.  Judge Fisher, on the other hand, refused to read Olson "to support the conclusion that law enforcement privileges should not be recognized in FTCA suits, and that federal officers are left only with those privileges available to private citizens" because "Olson did not involve such privileges, and . . . the FTCA's text does not clearly foreclose their availability."  Id. at 857 (Fisher, J., concurring).  Judge Kleinfeld would have found that the FTCA claim was not preserved for appeal, but if it was, he would have joined Judge Fisher's concurrence.  Id. at 861-62 (Kleinfeld, J., concurring).

This case does not require us to reach the issue of what effect, if any, Olson has on the continuing viability of Caban II, because the district court dismissed the case for lack of a private analogue and did not reach the merits.  Thus, the district court did not have the occasion to opine on the substantive standards applicable to the ICE agents' conduct here, and we need not reach the issue now.  Caban II remains the law of this Circuit.

court, the Northern District of California, has found the analogy to law enforcement persuasive in the context of an FTCA claim based on an immigration detention. See Munyua, 2005 WL 43960, at *4, 2005 U.S. Dist. LEXIS 11499, at *12 ("The fact that the challenged activities took place at the border does not negate the analogy to law enforcement . . . ."). But in Olson, the Court instructed that "a court [must] look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA . . . ." 546 U.S. at 46 (emphasis added).

Regardless of this ambiguity, in the context of this case, the distinction between analogizing to a citizen's arrest and an officer's arrest is of little moment -- in both cases, the defendant will be liable for false arrest under New York law if the arrest is not privileged. See, e.g., Downs v. Town of Guilderland, 70 A.D.3d 1228, 1232, 897 N.Y.S.2d 264, 268 (3d Dep't 2010) (police officer's arrest privileged for purposes of false arrest claim if officer possessed probable cause to justify arrest), appeal dismissed, 15 N.Y.3d 742, 933 N.E.2d 203, 906 N.Y.S.2d 804 (2010); White v. Albany Med. Ctr. Hosp., 151 A.D.2d 859, 860, 542 N.Y.S.2d 834, 835 (3d Dep't 1989) ("In New York, a private citizen who makes an arrest does so at his peril; if the person arrested did not in fact commit the crime for which he is arrested, the person who arrests him is liable [for false arrest]

39

even if he acts in good faith or has probable cause to make an arrest."). Therefore, either analogue would suffice for present purposes.

The fact that New York law applies different substantive standards to citizens' and officers' arrests, see generally 59 N.Y. JUR. 2D FALSE IMPRISONMENT § 37, is also of no significance for present purposes because, under Caban II -- which provides the law of this Circuit -- immigration detentions executed by federal immigration officers are judged under federal standards (subject to the considerations discussed supra note 18).

Our conclusion that there is a private analogue to the government behavior at issue here receives further support from the fact that the FTCA explicitly waives sovereign immunity for "any claim" based on the "acts or omissions of investigative or law enforcement officers" "arising . . . out of . . . false imprisonment [and] false arrest." 28 U.S.C. § 2680(h) (emphasis added). The plain language of the statute suggests that the United States has indeed waived its sovereign immunity from suit as to Liranzo's "claim," which "aris[es] . . . out of . . . false imprisonment [and] false arrest." Id. In light of the considerations discussed above, the government's suggestion that we disregard the "false imprisonment" label Liranzo has affixed to his claim so as to find it not to be encompassed by this

40

explicit statutory language is unpersuasive.  <u>See</u> Def.'s Letter Br. at 3.

<u>Akutowicz</u> is not to the contrary.  The district court in this case relied on <u>Akutowicz</u>'s reasoning that "the withdrawal of a person's citizenship constitutes a quasi-adjudicative action for which no private analog exists," because "no private citizen is empowered to certify the loss of American nationality," 859 F.2d at 1125-26.  <u>See</u> Mem. & Order at 9-10.  But in <u>Akutowicz</u>, there was no detention.  The only action complained of was the removal of the plaintiff's citizenship.  Citizenship is a legal status, which only the federal government is capable of altering. A private individual cannot, without subsequent government action, cause injury to another's citizenship.  But a private person is of course capable of falsely arresting another.  <u>See generally</u> <u>Caban II</u>, 728 F.2d at 71 (quoting <u>Broughton</u>, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93, 335 N.E.2d at 314)(setting out the elements of a false arrest claim).

As for the government's argument that immigration detentions are quintessentially federal and therefore no private analogue exists per <u>Feres</u> and its progeny, <u>see</u> Def.'s Br. 14, 16, although the "[p]ower to regulate immigration is unquestionably exclusively a federal power," <u>DeCanas v. Bica</u>, 424 U.S. 351, 354 (1976), <u>superseded by statute on other grounds as stated in Chamber of Commerce of United States v. Whiting</u>, 131 S. Ct. 1968,

41

1974-75 (2011), it is not clear that immigration detentions are necessarily and exclusively _federal_ acts.  For instance, under current federal immigration law, "State and local law enforcement officials" may be empowered (consistent with state law) to "arrest and detain" aliens in certain circumstances.  See 8 U.S.C. § 1252c(a); 8 U.S.C. § 1103(a)(10); _Arizona v. United States_, 132 S. Ct. 2492, 2506 (2012) (describing limited federal statutory authorization for state immigration detentions).

The fact that a complained of action occurs in a quintessentially federal context, moreover, does not necessarily mean that no private analogue exists.  While the federal military is undoubtedly quintessentially federal, so is the federal prison system.  The Supreme Court nonetheless, in _Muniz_, refused to extend _Feres_ to the latter context.  See _Muniz_, 374 U.S. at 162. In distinguishing _Feres_, the _Muniz_ Court minimized _Feres_'s reliance on the fact that the military is quintessentially federal.  _Id._  It reasoned that "[i]n the last analysis, _Feres_ seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course

of military duty."[19]  Id. (quotation marks and ellipsis omitted). These considerations are not present in the non-military context. The case before us is thus more closely akin to Muniz than Feres. In sum, it does not follow from the fact that immigration is a quintessentially federal function that immigration detention is without a private non-federal officer analogue.  Even for alleged torts occurring in quintessentially federal contexts, the question remains whether analogous private liability exists under state law -- and here, we conclude that it does.

For these reasons, we conclude that the district court erred in finding that there was no private analogue to Liranzo's claims.  We express no view, however, as to Liranzo's argument that he is entitled to a trial on the merits on remand.  See Pl.'s Br. 9, 14.  We leave it to the district court to consider whether, under the circumstances of this case, his action is

---

[19] One commentator has construed the post-Feres case law as having abandoned reliance on the original rationales articulated in Feres, and as having replaced them with new rationales for the "Feres doctrine" barring FTCA claims by active servicemen and -women.  See CHEMERINSKY, supra, at 674-75 ("Interestingly, the Court's explanation [for the Feres doctrine] has shifted over time.  Originally, in Feres, the Court emphasized that the government could be held liable under the [FTCA] only for activities that also are undertaken by private entities . . . . But . . . the Supreme Court expressly discarded this limitation on recovery under the act [in Indian Towing and Rayonier], permitting suits even for activities done solely by the federal government. . . .  Subsequent to the Feres decision, the Court began emphasizing a different rationale for precluding recovery for injuries received incident to military service: the need to preserve military discipline.").

subject to dismissal on the merits on motion to dismiss or for summary judgment.

## C.  Liranzo's Fourth Amendment Claim

Liranzo has not raised any argument against the district court's dismissal of his separate Fourth Amendment claim.  See Mem. & Order at 11.  We therefore affirm the district court's ruling in this respect.  See Universal Church v. Geltzer, 463 F.3d 218, 229 (2d Cir. 2006) ("Generally[,] claims not raised on appeal are deemed abandoned, at least when it is the appellant who fails to do so.").

**CONCLUSION**

For the foregoing reasons, we affirm as to the district court's dismissal of Liranzo's Fourth Amendment claim.  We vacate the district court's judgment insofar as it found an absence of subject matter jurisdiction over Liranzo's FTCA claims and remand for further proceedings in the district court.  Because the district court did not have the occasion to consider which standard applies on the merits, the district court should consider in the first instance on remand which federal standards govern the determination of whether the government official's actions here were privileged.