ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Plaintiff Donald James Anson ("Plaintiff") commenced this action on January 24, 2007, alleging a cause of action against the United States of America (the "Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 - 2680 (the "FTCA"). (Dkt. 1 at 11).[1] Subsequently, Plaintiff filed an Amended Complaint, which is the operative pleading in this *148 action, increasing the amount of damages alleged from $75,000.00 to $125,000.00. (Dkt. 21 at 11; see Dkt. 1 at 11). Specifically, Plaintiff claims that on April 13, 2005, he was scheduled for transport from the Buffalo Federal Detention Facility (the "Facility") in Batavia, New York, where he was detained, to a court proceeding at the federal courthouse in Rochester, New York. (Dkt. 21 at 6). The United States Marshals Service (the "USMS") was responsible for transporting Plaintiff. (Id. ). The USMS used a black 2001 Ford Expedition (the "Expedition" or the "Vehicle") for court transport. (Id. ).
Generally, the USMS deputies escorted prisoners into the Expedition through its rear passenger-side door. (Id. ). According to Plaintiff, on this occasion the USMS deputies told him to enter the Vehicle through the rear driver-side door so that they would avoid the inconvenience of having to reset a loose piece of weather stripping that hung over the rear passenger-side door. (Id. at 6-7). Plaintiff, who was handcuffed and secured by a waist chain and ankle shackles, alleges that he attempted to climb into the Vehicle through the rear driver-side door. (See id. at 7-8).
The Expedition's second-row seating contained a 70/30 foldable split-bench seat. (Id. at 7). Plaintiff alleges that in order for him to reach the third row via the rear driver-side door, the USMS deputies had to fold down the 70% portion of the split-bench seat (the "three-quarters seat"), and then Plaintiff had to climb over it. (See id. at 7-8). Had Plaintiff entered through the rear passenger-side door, the USMS deputies could have folded down the 30% portion of the split-bench seat (the "one-quarter seat") and rotated it forward to permit unimpeded walkable access to the third row. (Id. at 7).
Plaintiff alleges that as he began to climb over the three-quarters seat, his "right foot and/or leg chain [became] caught on the back of the folded down (but not slid [sic] forward) second row seat causing him to trip and fall." (Id. at 8). Plaintiff landed on his left elbow, which he claims caused him injury to his left shoulder, including a possible torn rotator cuff. (Id. ). Plaintiff claims that had the USMS deputies acted with reasonable diligence by resetting the loose weather stripping and directing him through the rear passenger-side door, he would not have had to climb over the three-quarters seat and would not have injured himself. (Id. ).
The most critical distinction between Plaintiff's account of the accident and the Government's version is Plaintiff's point of entry into the Vehicle. Whereas Plaintiff contends he was instructed to enter the Vehicle through the rear driver-side door, the Government maintains that Plaintiff, in fact, entered through the rear passenger-side door. After considering all of the evidence, the Court finds that Plaintiff has failed to carry his burden, by a preponderance of the evidence, that the Government was negligent in loading him into the Vehicle. This Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.
PROCEDURAL BACKGROUND
Plaintiff commenced this action on January 24, 2007, by filing a pro se Complaint, alleging a cause of action pursuant to the FTCA. (Dkt. 1). Plaintiff filed an Amended Complaint, the operative pleading, on September 6, 2007. (Dkt. 21). On September 20, 2007, the Government filed a motion to dismiss for lack of subject matter jurisdiction. (Dkt. 22). Specifically, the Government argued that Plaintiff's claim fell within the "discretionary function" exception to FTCA liability. (Dkt. 23 at 5-13).
On November 5, 2008, United States Magistrate Judge H. Kenneth Schroeder, *149 Jr. recommended that the Government's motion be denied. (Dkt. 31). Judge Schroeder stated that in "[a]ccepting [P]laintiff's allegations as true," he must conclude that the USMS "compromised [P]laintiff's safety to avoid pushing the loose weather-stripping back into place before closing the door," and that "such a decision would not be based upon considerations of public policy." (Id. at 7). As such, Judge Schroeder determined that Plaintiff's claims fell within the so-called "negligent guard" theory of liability, which precluded the application of the discretionary function exception. (Id. ). Neither the Government nor Plaintiff timely filed any objections, and, on November 28, 2008, United States District Judge Richard J. Acara issued an Order adopting Judge Schroeder's Report and Recommendation. (Dkt. 32). On January 22, 2009, the Government filed an Answer to the Amended Complaint. (Dkt. 35).[2]
After discovery was completed, this case was reassigned to the undersigned for all further proceedings on January 30, 2015. (Dkt. 167). A bench trial commenced on August 21, 2017, and continued through August 23, 2017. (Dkt. 214; Dkt. 217). Prior to the commencement of the bench trial, the Government filed a motion in limine -which remains pending-seeking to limit the amount of damages Plaintiff could be awarded if he carried his burden of proof on liability. (Dkt. 206).
Following the bench trial, Plaintiff submitted proposed findings of fact and conclusions of law on December 18, 2017. (Dkt. 222). The Government submitted its responsive proposed findings of fact and conclusions of law on February 9, 2018. (Dkt. 224). Plaintiff submitted his reply papers on February 23, 2018. (Dkt. 227).
FINDINGS OF FACT
The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1). The Court has made its Findings of Fact based on the testimony and exhibits presented at trial, and has discussed only those issues considered "material to the resolution of the parties' claims." Cliffstar Corp. v. Alpine Foods, LLC , No. 09-CV-00690-JJM, 2016 WL 2640342, at * 1 (W.D.N.Y. May 10, 2016) (citing I.N.S. v. Bagamasbad , 429 U.S. 24, 25, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976) ("[C]ourts ... are not required to make findings on issues the decision of which is unnecessary to the results they reach.") ). Moreover, "the distinction between law and fact is anything but clear-cut" and therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling. Id. (quotation marks and citations omitted).
I. Burden of Proof
"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." Brown v. Lindsay , Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." Id. (quoting Fischl v. Armitage , 128 F.3d 50, 55 (2d Cir. 1997) ). "Under the preponderance of the evidence standard, if the evidence is evenly balanced, the party with the burden of proof loses." Richardson v. Merritt , No. 12-CV-5753 (ARR), 2014 WL 2566904, at *5 (E.D.N.Y. June 4, 2014) (citing Kosakow v. New Rochelle Radiology Assocs. , 274 F.3d 706, 731 (2d Cir. 2001) ). In other words, if the credible evidence on a given issue is *150 evenly divided between the parties-that it is equally probable that one side is right as it is that the other side is right-then the plaintiff has failed to meet his burden.
II. Undisputed Facts [3]
The parties stipulate that the claims subject to this litigation arose out of an incident occurring on April 13, 2005. On that date, Deputy United States Marshals Paul L. Nielsen, Jr. ("Deputy Nielsen") and David L. Say, Jr. ("Deputy Say") (collectively, "the Deputies"), secured Plaintiff at the Facility for transportation to a court appearance scheduled for 2:30 P.M. before United States Magistrate Judge Marian W. Payson at the United States District Court for the Western District of New York in Rochester, New York. Plaintiff was transported in the Expedition, which bore the license plate number "ATM 6209" and the VIN number "1FMPU16LB04315," and which was owned by the USMS. The parties also stipulate that the accident occurred at the Facility as Plaintiff, who was handcuffed and shackled at his ankles and waist, entered the Expedition. At the time of the accident, Deputy Say and Deputy Nielsen were present and were working within the scope of their employment.
III. Credibility
Resolution of the legal issues in this matter cannot be achieved without first making credibility determinations. Since Plaintiff was the only fact witness called to testify on his behalf, this case hinges upon the Court's assessment of Plaintiffs credibility. Although Deputy Nielsen's credibility was not left unscathed after the conclusion of cross-examination, the Court ultimately finds him to be a more credible witness than Plaintiff, and thus, credits his account of the accident.
A. Deputy Nielsen
It appeared evident to the Court that Deputy Nielsen's memory of the accident had dulled over the twelve years that had passed since its occurrence. Although Deputy Nielsen testified that Plaintiff proceeded through the rear passenger-side door (Dkt. 219 at 284:18-25, 285:1-9), he could not recall whether he or Deputy Say had lifted and rotated the one-quarter seat to permit Plaintiff access to the third row (Dkt. 220 at 318:15-17). Deputy Nielsen could not remember exactly where Deputy Say was positioned in relation to the Vehicle at the time Plaintiff fell. (Id. at 320:2-7). Until Deputy Nielsen was cross-examined with his own sworn declaration, he also could not recall exactly where Plaintiff landed when he fell in the Vehicle. (Id. at 342:14-20; see id. at 372-74). Furthermore, there were several instances during his testimony where it was unclear whether Deputy Nielsen was describing the standard operating procedures attendant to court transportation in general, or whether he was testifying as to the specific events of April 13, 2005, based upon his own independent recollection. (See id. at 320:21-25, 321:1-19, 335:9-25, 336:1-22, 347-49).
Despite having trouble recalling certain facts surrounding the accident, Deputy Nielsen was resolute in testifying that Plaintiff entered the rear passenger-side door of the Vehicle (Dkt. 219 at 284:18-25, 285:1-9; Dkt. 220 at 350:12-17), and, when confronted on cross-examination, he confirmed that he held an independent recollection of the one-quarter seat being "flipped up" on April 13, 2005 (Dkt. 220 at 320:25, 321:1-19). Deputy Nielsen affirmed this recollection on redirect examination as well. (Id. at 350:22-25, 351:1-7). Deputy Nielsen also testified that he had an independent recollection of pushing the loose *151 weather stripping back into place within the rear passenger-side door on the date of the accident. (Id. at 329:12-15, 330:18-23). This action would not have been necessary had Plaintiff entered the Vehicle through the rear driver-side door. Based upon the Court's observations of Deputy Nielsen at trial, including his demeanor and conduct, as well as his testimony, the Court finds Deputy Nielsen's account of the April 13, 2005, accident to be largely credible.
In his reply papers, Plaintiff argues that, based upon Deputy Nielsen's own testimony, it would have been impossible for Plaintiff to have entered the rear passenger-side door and fall in a manner that permitted him to "strike his left elbow on the upright portion of the middle seat." (Dkt. 227 at ¶ 27). This is because the "upright portion of the second row seat would have been on [Plaintiff's] right side and not his left side." (Id. ). The Court disagrees with Plaintiff's assertion.
Deputy Nielsen testified that he observed Plaintiff enter through the rear passenger-side door and step forward into the Vehicle-positioning the unlatched and folded-up one-quarter seat to Plaintiff's right-hand side. (See Dkt. 220 at 324:1-25, 325:1-3, 333:22-25, 340:9-19). At this point, the three-quarters seat remained in an upright position. (Id. at 338:23-25, 339:1-2). Deputy Nielsen also testified that when Plaintiff fell, he did not simply fall straight towards the third-row seat; he also twisted himself and placed his elbow out in order to break his fall. (Dkt. 219 at 285:18-25; Dkt. 220 at 341:3). The Court does not accept Plaintiff's view that it was impossible for Plaintiff to have struck his left elbow on the upright three-quarters seat as recounted by Deputy Nielsen. Rather, crediting Deputy Nielsen's description of the fall, with Plaintiff twisting himself in an effort to catch his fall, Plaintiff could have fallen in a manner consistent with his injuries.
B. Plaintiff
In assessing Plaintiff's credibility, the Court finds that his trial testimony was marred by several inconsistencies. For example, Plaintiff testified that he reported his alleged shoulder injury just three days after the accident occurred. (Dkt. 218 at 48:1-3). However, no medical record in evidence appears to document such a visit, which would have occurred on April 16, 2005. In fact, the first medical record noting any bodily complaint or evaluation of Plaintiff's shoulder was dated May 4, 2005 (see Government's Trial Exhibit 430 at 1018)-three weeks after the injury allegedly occurred. In addition, a medical record entry, dated April 19, 2005, indicates that Plaintiff "placed a sick call slip to receive vitamins," but it lacks any notation pertaining to complaints of shoulder pain. (Id. ). Accordingly, the Court questions the veracity of Plaintiff's trial testimony in which he describes significant pain arising soon after the accident occurred. (Dkt. 218 at 47:18-25, 48:8-12). Plaintiff further explained that he waited to report his injury for the purported three-day duration because he was "not one that likes to go to doctors or deal with the medical" staff at the Facility. (Dkt. 218 at 48:5-7; see id. at 105:6-12). Yet, Plaintiff also testified that he had visited medical personnel "multiple times" before the accident. (Id. at 105:13-25, 106:1-5).
Plaintiff further testified that the only reason the Deputies directed him to enter the Vehicle through the rear driver-side door was to avoid having to set the weather stripping back into place. (Id. at 36:8-17, 81:25, 82:1-9).[4] Plaintiff confirmed that *152 the weather stripping was a constant problem and that despite this issue, the usual process before April 13, 2005-and in every instance thereafter-was for the Deputies to load the prisoners through the rear passenger-side door. (Id. at 29, 30:1-7, 81:16-24, 83:12-20). Plaintiff provides no persuasive explanation for why-on this single occasion-the Deputies decided to deviate from this procedure. Indeed, there is no logical explanation in the record to support any such deviation. It simply does not make sense that an alternative, more cumbersome means of egress into the Vehicle would have been selected on the date in question, all to avoid the relatively simple task of adjusting the weather stripping.
There is some suggestion in the trial record that the Deputies were in a hurry to secure Plaintiff for his court proceeding on the morning of the accident. Deputy Nielsen testified that he and Deputy Say performed two court trips from the Facility on April 13, 2005. (Dkt. 219 at 283:7-25, 302:19-23, 303:1-7). According to Deputy Nielsen, the Deputies failed to secure Plaintiff for transport on the first trip, which he explained may have been due to the fact that Plaintiff's court hearing had been rescheduled from April 14, 2005, to April 13,2005. (See Dkt. 220 at 355:24-25, 356-357). As a result, Deputy Nielsen testified that the Deputies felt a sense of "urgency" in returning to the Facility to secure Plaintiff for a second trip back to the federal courthouse in Rochester. (See id. at 330:25, 331:1-10).
However, there is no indication that any initial untimeliness caused the Deputies to alter the standard process for transporting prisoners on April 13, 2005. Plaintiff even acknowledges that it would have taken the Deputies a matter of seconds to reset the weather stripping. (Dkt. 21 at 8 (alleging that it would take "10 to 15 seconds ... to press the loose section of weather striping [sic] back into place after using the passenger-side door"); see Dkt. 220 at 351:20-25 (Deputy Nielsen testifying that it would take only "[s]econds" to reset the loose weather stripping), 366:12-15 (same) ). This fact is consistent with Deputy Nielsen's testimony that it would make little sense to require a restrained prisoner to climb through the rear driver-side door even if they were in a hurry, because to do so would take longer and cause greater difficulty than simply resetting the weather stripping. (Dkt. 220 at 360:1-20). Furthermore, Deputy Nielsen clarified that the procedures for prisoner transportation were followed in every instance where a prisoner was secured for court transport, and thus, time could only be "made up" while in-transit and not during the loading procedures undertaken at the Facility. (See id. at 358:14-25, 359:1-10).
It is also undisputed that Plaintiff was handcuffed and secured by a waist chain (Dkt. 218 at 22:6-10, 16-21; see Court Exhibit 1 at ¶ 3), and that this was the standard procedure when transporting prisoners to court (Dkt. 219 at 264:25, 265:1-10; Dkt. 220 at 334:9-19; see Plaintiff's Trial Exhibit 1 (USMS Directive on the use of restraining devices) ). Although Plaintiff testified that it was the usual practice for the Deputies to either reset the weather stripping themselves or to instruct an inmate do so (Dkt. 218 at 81:16-19), Plaintiff also confirmed that he could only move his hands a "couple inches" while restrained by the waist chain. (Id. at 45:18-25), Plaintiff's testimony regarding his freedom of motion is consistent with Deputy Nielsen's testimony that prisoners were never asked to reset the weather stripping because the *153 waist chain prevented them from reaching much higher than breast level. (Dkt. 219 at 266:17-25, 267:1, 275:8-18).
The Court also notes that the Expedition was equipped with a running board, which provided an extra step to assist one's entry into the passenger compartment of the Vehicle. (See Dkt. 218 at 38:25, 39:1-11). This fact appears inconsistent with Plaintiff's testimony that Deputy Nielsen used a milk crate as an extra step to assist with entry into the Expedition. (See id. at 27:5-9; see also Dkt. 219 at 281:12-25, 282:1-6 (Deputy Nielsen testifying that a milk crate was not used to assist entry into the Vehicle because it was equipped with a running board) ).
Finally, the Government elicited the fact that there had been a judicial finding of perjury with respect to Plaintiff in a prior proceeding. (Dkt. 218 at 121-29). Specifically, Plaintiff testified that United States District Judge Charles J. Siragusa found that he had "submitted false statements and testimony to the Court" in a prior proceeding relating to his past criminal matter. (Id. at 129:18-21). The Court notes that Judge Siragusa's Decision and Order was not entered into evidence at trial, and the Court does not rely upon it in making this credibility determination. However, Plaintiff's testimony that he was found to have committed perjury is relevant to the Court's determination of his credibility in this matter. See Fed. R. Evid. 608(b) ; United States v. Bagaric , 706 F.2d 42, 65 (2d Cir. 1983) (permitting the cross-examination of a witness with respect to another judge's negative credibility finding pursuant to Rule 608(b) because "it is clear that the prior misconduct need not have created criminal liability or resulted in a conviction"), abrogated on other ground by Nat'l Org. for Women, Inc. v. Scheidler , 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ; Walker v. Firestone Tire & Rubber Co. , 412 F.2d 60, 63 (2d Cir. 1969) ("[T]he rule seems to be well settled that although the opponent is not permitted to adduce extrinsic evidence that a witness lied on a previous occasion, he may nonetheless ask questions to that end."); see also United States v. Terry , 702 F.2d 299, 316 (2d Cir. 1983) ("Proof that a judge of the District of Columbia Superior Court before whom Gerstman had testified as an expert had found that Gerstman had 'guessed under oath' was probative of the weight to be accorded to his testimony.").
Based upon the Court's observations of Plaintiff at trial, including his demeanor and conduct, as well as his testimony, the Court finds Plaintiff's account of the April 13, 2005, accident to be less than credible. In evaluating the credibility of the parties, the Court is mindful that the ultimate burden of proof rests with Plaintiff. It was thus incumbent upon Plaintiff to establish his cause of action by a preponderance of the evidence. This Plaintiff failed to do. Accordingly, in setting forth its Conclusions of Law, the Court credits Deputy Nielsen's testimony that he and Deputy Say conducted themselves pursuant to the standard procedures for transporting a prisoner from the Facility to a court appearance, and that Plaintiff entered the rear passenger-side door of the Expedition at the time he fell.
IV. Material Facts Underlying the Accident
On April 13, 2005, the Deputies arrived at the Facility in the Expedition at around 7:00 A.M. to proceed with the scheduled court transport of inmates to the Rochester federal courthouse, (Dkt. 219 at 276:17-24). In general, "a list of prisoners that would be needed for court the next day would be faxed over to the [F]acility" the night before, so that it would be clear which prisoners would be prepared for transport. (Id. at 263:21-25, 264:1). However, *154 Plaintiff was not named on the initial list for court transport. (Id. at 279:21-25, 280:1-9). After checking in at the Facility's guardhouse, and depositing their weapons in the holding area, the Deputies proceeded in the Expedition through the north entrance of the Facility's garage. (Id. at 255:20-25, 256:1-5, 276:25, 277:1-5). The Deputies then entered the Facility and made their way to the "processing area," where the inmates were searched for weapons and restrained. (Id. at 277:13-24). Afterwards, the prisoners were escorted out of the Facility and into the garage where the Deputies loaded them into the Vehicle. (Id. ). The Deputies exited the garage in the Expedition through the south-facing garage door, and proceeded to Rochester. (Id. at 280:10-23).
After arriving at the federal courthouse and having unloaded the prisoners, the Deputies' supervisor asked whether they had also transported Plaintiff, and the Deputies responded that they had not done so. (Id. at 283:9-13). The Deputies drove back to the Facility to secure Plaintiff for his afternoon court appearance. (Id. at 283:20-24). Upon arriving back at the Facility, the Deputies executed the same process they had undergone in securing the first group of prisoners for transport. (Id. at 283:25, 284:1-17). Once Plaintiff had been secured from the processing area, he was led out into the garage. (Id. at 284:10-14; see Dkt. 218 at 25:18-21).
The Expedition was equipped with a barrier that divided the driver compartment from the passenger compartment. (Dkt. 218 at 30:15-23). The Deputies "were having a private conversation," and thus, decided to sit Plaintiff into the third row of the Expedition to place him "outside of earshot" of their discussion. (Dkt. 219 at 284:20-24; Dkt. 220 at 359:11-16). In order to do so, Plaintiff entered through the rear passenger-side door. (Dkt. 219 at 284:25, 285:1-10). This was because the one-quarter seat was "specifically designed for the seat back to flip down on to the base of the seat and then that whole seat, the back and the bottom, were designed to rotate forward." (Id. at 271:21-25, 272:1; see Dkt. 218 at 31:17-22). In other words, this mechanism "would ease access into th[e] third row" by providing enough room to permit a restrained inmate to "step into th[e] third row." (Dkt. 219 at 272:21-22, 273:1-5).
However, the adhesive that held the rear passenger-side door's weather stripping in place had begun to fail, causing anywhere from a "few inches to 4 to 5 feet" of the material to hang down over the doorframe. (Id. at 274:6-25, 309:2-5, 15-20; Dkt. 220 at 328:12-15; see Dkt. 218 at 29:8-15 (Plaintiff testifying that about "4 or 5 inches" of weather stripping would "sag down") ). This was a "regular" issue when loading prisoners through the rear passenger-side door of the Vehicle. (Dkt. 219 at 275:1-4; see Dkt. 218 at 29:2-7). As a result, a USMS deputy would have to push the weather stripping back into place when this occurred. (See Dkt. 219 at 275:5-19). The process of resetting the weather stripping would take only a matter of "seconds" to complete. (Dkt. 220 at 351:20-25).
On the date of the accident, one of the Deputies opened the rear passenger-side door for Plaintiff (see Dkt. 220 at 318:14-16), and then Deputy Nielsen reset the weather stripping above that door (id. at 329:12-19). One of the Deputies unlatched the one-quarter seat and flipped it up to permit entry into the third row of the Expedition. (Dkt. 219 at 272:2-22; Dkt. 220 at 320:15-19, 321:4-19, 350:22-25, 351:1). As Plaintiff entered the Vehicle, Deputy Nielsen stood about three or five feet behind him. (Dkt. 220 at 318:21-25, 319:1 -6). Plaintiff placed one foot on the Expedition's running board and was stepping inside the Vehicle with his other foot when *155 he slipped and fell (id. at 325:15-23)-twisting himself and hitting his left elbow on the upright three-quarters seat in an effort to break his fall (Dkt. 219 at 285:18-25; Dkt. 220 at 341:3-18). Plaintiff "picked himself up" and moved into the third row seat. (Dkt. 219 at 286:22-24; Dkt. 220 at 343:14-16; see Dkt. 218 at 46:1-4).
Plaintiff's fall "startled" Deputy Nielsen (Dkt. 220 at 343:19), who had "never seen anybody actually do that" (Dkt. 219 at 287:1-2). Deputy Say asked Plaintiff if he was all right and whether he wanted to see the medical staff, but Plaintiff responded with an "expletive" and said, "just take me to court." (Id. at 287:18-24; see Dkt. 218 at 47:4-9 (Plaintiff testifying that the Deputies asked if "it was bad," and Plaintiff responded, "I don't think so") ). Deputy Nielsen then "secured the seat" and "closed the door" before entering the Vehicle. (Dkt. 219 at 287:25, 288:1). Before leaving the Facility, Deputy Say again asked Plaintiff whether he wanted to see the medical staff, and, again, Plaintiff responded that he "just wanted to go to court." (Id. at 288:2-5).
The Deputies proceeded to transport Plaintiff to the federal courthouse in Rochester. (Id. at 288:12-18). When they arrived, Deputy Nielsen informed his supervisor of the incident, and made mention that they should expect a lawsuit. (Id. at 292:9-12; Dkt. 220 at 361:17-22). Deputy Nielsen's testimony indicated that this comment was based upon his understanding that Plaintiff had filed previous lawsuits. (Dkt. 220 at 361:3-22).
CONCLUSIONS OF LAW
I. Federal Tort Claims Act
Plaintiff claims that the Government negligently loaded him into the Expedition on April 13, 2005, causing him to fall and injure his left shoulder.
A. General Principles
" 'The United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " Liranzo v. United States , 690 F.3d 78, 84 (2d Cir. 2012) (quoting United States v. Mitchell , 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ). "Congress can waive the government's sovereign immunity, but only through clear and unequivocal statutory language, and waivers of sovereign immunity and their conditions must be strictly construed in the government's favor." Kwitek v. U.S. Postal Serv. , 694 F.Supp.2d 219, 224 (W.D.N.Y. 2010). The FTCA " 'constitutes a limited waiver by the United States of its sovereign immunity' and allows for a tort suit against the United States under specified circumstances." Hamm v. United States , 483 F.3d 135, 138 (2d Cir. 2007) (quoting Millares Guiraldes de Tineo v. United States , 137 F.3d 715, 719 (2d Cir. 1998) ).
[T]he FTCA waives the sovereign immunity of the United States against claims for property damage or personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
McGowan v. United States , 825 F.3d 118, 125 (2d Cir. 2016) (quoting 28 U.S.C. § 1346(b)(1) ).
B. The Government's Renewed Challenge to Subject Matter Jurisdiction
1. Legal Standard
The Government purports to move to dismiss for lack of subject matter jurisdiction *156 pursuant to Rule 12(b)(1). A Rule 12(b)(1) motion is subject to a pre-answer limitation: it "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Because the Government has filed an answer to the amended complaint (Dkt. 35; Dkt. 63), a Rule 12(b)(1) motion is not the correct procedural means for challenging the Court's subject matter jurisdiction. Federal Rule of Civil Procedure 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3) ; see Arbaugh v. Y & H Corp. , 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("The objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." (citation omitted) ). Thus, the Court will construe the Government's motion as one made pursuant to Rule 12(h)(3). See Bell v. Ramirez , No. 13-cv-7916 (PKC), 2014 WL 7178344, at *2 (S.D.N.Y. Dec. 9, 2014) (construing post-answer Rule 12(b)(1) motion as Rule 12(h)(3) motion); Greystone Bank v. Tavarez , No. 09-CV-5192 (SLT), 2010 WL 3325203, at *1 (E.D.N.Y. Aug. 19, 2010) (collecting cases).
The standard governing a Rule 12(h)(3) motion is the same as that governing a motion under Rule 12(b)(1). Bell , 2014 WL 7178344, at *2 ; see Canadian St. Regis Band of Mohawk Indians v. New York , 388 F.Supp.2d 25, 29 (N.D.N.Y. 2005) ("The main 'distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party.' " (quoting Berkshire Fashions, Inc. v. M. V. Hakusan II , 954 F.2d 874, 879 n.3 (3d Cir. 1992) ) ). A district court properly dismisses an action under Rule 12(b)(1) for lack of subject matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate it...." Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l , 790 F.3d 411, 416-17 (2d Cir. 2015) (quoting Makarova v. United States , 201 F.3d 110, 113 (2d Cir. 2000) ).
"When 'the case is at the pleading stage and no evidentiary hearings have been held ... [a court] must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.' " Quinoy v. Pena , No. 13-CV-1945 (NSR), 2014 WL 1998239, at *4 (S.D.N.Y. May 14, 2014) (quoting Conyers v. Rossides , 558 F.3d 137, 143 (2d Cir. 2009) ). However, "[o]nce a jurisdictional challenge is raised at trial, the plaintiff will be required to establish his or her case for the court's jurisdiction over defendant by a preponderance of the evidence." Pilates, Inc. v. Pilates Inst., Inc. , 891 F.Supp. 175, 182 n.1 (S.D.N.Y. 1995) ; see Citigroup Inc. v. City Holding Co. , 97 F.Supp.2d 549, 564 (S.D.N.Y. 2000) ("Ultimately, if a jurisdictional challenge is raised at trial, [the plaintiff] will bear the burden of establishing jurisdiction over a defendant by a preponderance of the evidence."). "Once challenged, the burden of establishing jurisdiction rests with the party asserting that it exists." Clarke v. United States , 107 F.Supp.3d 238, 243 (E.D.N.Y. 2015) (quoting Augienello v. F.D.I.C , 310 F.Supp.2d 582, 587-88 (S.D.N.Y. 2004) ).
In ruling upon a challenge to subject matter jurisdiction, "the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi , 215 F.3d 247, 253 (2d Cir. 2000) (citing Cargill Int'l S.A. v. M/T Pavel Dybenko , 991 F.2d 1012, 1019 (2d Cir. 1993) ); see also *157 Sharkey v. Quarantillo , 541 F.3d 75, 83 (2d Cir. 2008) ("A district court has discretion to hold a hearing to resolve factual disputes that bear on the court's jurisdiction"). A district court "must" consider evidence outside of the pleadings "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." Robinson v. Gov't of Malaysia , 269 F.3d 133, 149 n.6 (2d Cir. 2001) ; see S.R.P. ex rel. Abunabba v. United States , 676 F.3d 329, 332 (3d Cir. 2012) ("Because the Government's motion presented a factual challenge to subject matter jurisdiction, the District Court was not confined to the allegations in [the plaintiff]'s complaint, and was entitled to independently evaluate the evidence to resolve disputes over jurisdictional facts."). Furthermore, courts consider the testimony elicited during a bench trial in determining whether the FTCA's discretionary function exception is applicable. See Brown v. United States , 661 F.Supp.2d 341, 362 (E.D.N.Y. 2009) (relying on trial testimony in applying the exception in a bench trial decision); see also Kwitek , 694 F.Supp.2d at 228 (denying the application of the exception after a bench trial and noting that its conclusion was "supported by the trial testimony").
2. The "Discretionary Function" Exception
In renewing its motion to dismiss for lack of subject matter jurisdiction, the Government "relies on the FTCA's statutory 'discretionary function' exception, which expressly precludes '[claims] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty ... whether or not the discretion involved be abused.' " Kwitek , 694 F.Supp.2d at 227 (quoting 28 U.S.C. § 2680(a) ). "Under the discretionary function exception to the FTCA, the court lacks subject matter jurisdiction to hear an FTCA claim if the government's acts or omissions were discretionary." Brown , 661 F.Supp.2d at 360 (citation omitted).
In determining whether the discretionary function exception applies, courts evaluate whether both of two conditions are met: "(1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." Coulthurst v. United States , 214 F.3d 106, 109 (2d Cir. 2000) (quoting United States v. Gaubert , 499 U.S. 315, 322-23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) ). "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." Gaubert , 499 U.S. at 323, 111 S.Ct. 1267 (quotation marks and citations omitted).
A plaintiff "can overcome the FTCA's discretionary function exception if he can demonstrate that the officers' actions in this case were the result of laziness, carelessness, or inattentiveness, rather than grounded in policy considerations." Young v. United States , No. 12-CV-2342 (ARR) (SG), 2014 WL 1153911, at *15 (E.D.N.Y. Mar. 20, 2014). This so-called "negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction." Triestman v. Fed. Bureau of Prisons , 470 F.3d 471, 476 (2d Cir. 2006). When applicable, the alleged "negligent acts neither involve an element of judgment or choice within the meaning of Gaubert nor are grounded in considerations of *158 governmental policy." Coulthurst , 214 F.3d at 109.
A plaintiff bears "the initial burden to state a claim that is not barred by the [discretionary function exception]." Molchatsky v. United States , 713 F.3d 159, 162 (2d Cir. 2013). However, "[n]either the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving the applicability of the discretionary function exception." Ruiz ex rel. E.R. v. United States , No. 13-CV-1241 (KAM) (SMG), 2014 WL 4662241, at *4 (E.D.N.Y. Sept. 18, 2014). Neither the Government nor Plaintiff provides any argument on this point in their post-trial submissions.
"[G]enerally it is held that the Government bears the burden of proving the applicability of the discretionary function exception, although there is disagreement." 14 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, & Helen Hershkoff, Federal Practice and Procedure § 3658.1 at 613-14 (4th ed. 2015) (collecting cases); see S.R.P. , 676 F.3d at 345 n.2 (recognizing circuit split); Carroll v. United States , 661 F.3d 87, 104 (1st Cir. 2011) (same); Hart v. United States , 630 F.3d 1085, 1089 n.3 (8th Cir. 2011) (same). Furthermore, several district courts in this Circuit have placed the burden of proof of establishing the applicability of this exception on the Government. See, e.g., Molchatsky v. United States , 778 F.Supp.2d 421, 431 (S.D.N.Y. 2011), aff'd , 713 F.3d 159 (2d Cir. 2013) ; Saint-Guillen v. United States , 657 F.Supp.2d 376, 387 n.5 (E.D.N.Y. 2009) ; King v. United States , 491 F.Supp.2d 286, 296 (D. Conn. 2007).
This Court agrees with what appears to be the prevailing view in this Circuit that the Government bears the burden of establishing the applicability of the discretionary function exception. See Coulthurst , 214 F.3d at 110 ("It is not enough to establish that an activity is not mandated by statute and involves some element of judgment or choice; to obtain dismissal of the suit, the United States must also establish that the decision in question was grounded in considerations of public policy." (emphasis added) ); accord S.R.P. , 676 F.3d at 345 n.2 ("Although the discretionary function exception is jurisdictional on its face, it is analogous to an affirmative defense. Therefore, just as a plaintiff cannot be expected to disprove every affirmative defense that a defendant could potentially raise, so too should a plaintiff not be expected to disprove every exception to the FTCA. Moreover, the Government will generally be in the best position to prove facts relevant to the applicability of the discretionary function exception."). "If the Government responds by demonstrating that the action falls within a discretionary framework, a plaintiff must rebut the Government's showing sufficiently to demonstrate that there is a plausible case for non-discretionary or non-policy action in order to defeat dismissal." Molchatsky , 778 F.Supp.2d at 431 (citing Coulthurst , 214 F.3d at 110 ); see also Young , 2014 WL 1153911, at *17 ("Plaintiff has ... not met his burden to establish that the negligent guard theory applies to this case.").
Here, the Court finds that Plaintiff has met his initial burden of stating a claim that falls within the scope of FTCA's waiver of sovereign immunity. See S.R.P. , 676 F.3d at 333 (noting that "a plaintiff bears the burden of establishing that his claims fall within the scope of the FTCA's waiver of the federal government's sovereign immunity (i.e., that the requirements of 28 U.S.C. § 1346(b)(1) are met)"). Plaintiff's Complaint alleges that the Deputies were negligent in loading him into the Vehicle through the rear driver-side door instead of the rear passenger-side door in *159 order to avoid the simple task of resetting the loose weather stripping. (Dkt. 21 at 6). Plaintiff testified at trial that this was the only reason of which he was aware that explained the Deputies' decision to direct him into the Vehicle through the rear driver-side door. (Dkt. 218 at 36:8-17, 81:25, 82:1-9). Since the parties agree that the appropriate method of loading a prisoner into the third row of the Expedition is through the rear passenger-side door (Dkt. 222 at ¶ 21; Dkt. 224 at 17), Plaintiff has satisfied his initial burden of demonstrating that the Deputies' "actions in this case were the result of laziness, carelessness, or inattentiveness, rather than grounded in policy considerations." Young , 2014 WL 1153911, at *15 ; see Coulthurst , 214 F.3d at 109 (stating that a government official's actions motivated by "laziness," "haste," or "inattentive[ness]" could form the basis for liability under the FTCA).
The Government uses Deputy Nielsen's testimony that Plaintiff was loaded into the Expedition through the rear passenger-side door to contend that Plaintiff can point to no negligent conduct upon which to ground his negligent guard theory of liability. (Dkt. 224 at 46-48). However, the Government has jumped ahead of itself by failing to address its own burden of proof of first establishing the applicability of the discretionary function exception. In other words, the Government does not point to any evidence elicited at trial that satisfies the requirements of the two-pronged test discussed above.
The Court is aware that some cases have determined that certain USMS transportation decisions are subject to the discretionary function exception. See Menolascina v. United States , No. 12 C 90, 2013 WL 707920, at *2-3 (N.D. Ill. Feb. 26, 2013) (applying the exception to an FTCA case alleging the negligent placement of a crate used in assisting the plaintiff prisoner to board a van); Crane v. United States , No. 3:10-68-AC, 2011 WL 7277317, at *6 (D. Or. Nov. 29, 2011) (applying the discretionary function exception to an FTCA claim alleging that the USMS deputies did not provide adequate assistance to a prisoner exiting a transport vehicle), report and recommendation adopted , No. 3:10-CV-00068-AC, 2012 WL 442748 (D. Or. Feb. 9, 2012). Deputy Nielsen testified that the method by which he and Deputy Say proceeded on April 13, 2005, was consistent with the "standard operating procedure" performed at the Facility. (See, e.g. , Dkt. 219 at 284:3-17; Dkt. 220 at 336:23-25, 337:1-5, 345:9-15; 352:10-20). Deputy Nielsen also noted that the process for directing a prisoner to enter the Vehicle was not based upon a "regulation." (Dkt. 220 at 345:9-15). However, this testimony is not akin to eliciting evidence from a supervisory governmental official regarding the extent to which statutes, regulations, or agency guidelines restrict the performance of USMS deputies in loading prisoners into a court transport vehicle. Cf. Crane , 2011 WL 7277317, at *6 (noting that the Government provided statements from "senior deputies charged with supervising prisoner operations" that "there are no regulations 'of any sort' that mandate particular conduct in assisting prisoners as they exit from the van"); Brown , 661 F.Supp.2d at 362 (applying the discretionary function exception where the Government presented testimony from a superintendent "that the [National Park Service] Management Policies ... left decisions regarding public safety in the discretion of the decision makers at the park level," and that "there is no mandated policy" or particular "requirement" to post signs or to otherwise warn the public of certain dangers attendant to diving into a sandbar).
The parties stipulated to the admission of the USMS Directive for prisoner operations relating to restraining devices. (Plaintiff's Trial Exhibit 1). This document *160 focuses on the use of restraining devices in general, and only tangentially references issues pertaining to prisoner transportation. (Id. ). There is no indication in the evidence adduced at trial as to whether this USMS Directive represents the definitive agency guidance pertaining to the transportation of restrained prisoners. In other words, it is not at all clear whether all relevant USMS directives pertaining to the transportation of restrained prisoners were submitted as trial evidence. Cf. Crane , 2011 WL 7277317, at *6 (noting that the Government provided a copy of the USMS directive that specifically addressed "how to screen prisoner transport vehicles, how to secure prisoners in the transport vehicles, and on the duties of deputies in the 'contact' and 'cover' positions during loading and unloading of prisoners"); Brown , 661 F.Supp.2d at 363-64 (relying on specific language in the National Park Service Management policies indicating that the relevant decisions were discretionary).
In sum, the Government failed to produce sufficient evidence at trial to establish that the USMS prisoner transportation decisions at issue here involved "an element of judgment or choice," or that loading prisoners into the rear passenger-side door to reach the third row seat was grounded in "policy considerations." See Coulthurst , 214 F.3d at 109-110. As such, the Court finds that the Government has failed to carry its burden to demonstrate that the "discretionary function" exception applies in this circumstance.
Therefore, the Court finds that the Government has failed to carry its burden of satisfying the two-pronged test necessary for the application of the discretionary function exception, and thus, the Court concludes that it has subject matter jurisdiction to entertain Plaintiff's FTCA claim on the merits. Accordingly, the Government's renewed motion to dismiss for lack of subject matter jurisdiction is denied.
C. Plaintiff has Failed to Prove Negligence by a Preponderance of the Evidence
"[T]he FTCA does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." In re Orthopedic Bone Screw Prod. Liab. Litig. , 264 F.3d 344, 361-62 (3d Cir. 2001), as amended (Oct. 10, 2001); see Woodworth v. United States , No. l:14-CV-00674-RJA-JJM, 287 F.Supp.3d 345, 351, 2017 WL 6884407, at *3 (W.D.N.Y. Dec. 27, 2017) ("[T]he FTCA 'does not create federal substantive causes of action.' " (quoting Sumner v. United States , 794 F.Supp. 1358, 1364 (M.D. Tenn. 1992) ) ); see also Liranzo v. United States , 690 F.3d 78, 86 (2d Cir. 2012) ("[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees."). "[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." Dorking Genetics v. United States, 76 F.3d 1261, 1266 (2d Cir. 1996) (quoting Rayonier Inc. v. United States , 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) ). Stated another way, "[u]nder the FTCA's private analogue requirement, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." Watson v. United States , 865 F.3d 123, 134 (2d Cir. 2017) (quotation marks and citation omitted). "The private analogue requirement does not mandate the existence of liability for the exact same act by a private actor."
*161 Watson v. United States , 133 F.Supp.3d 502, 525 (E.D.N.Y. 2015). Instead, a court must " 'look further afield' for a private analogue when the government in fact is the only entity that performs the actions complained of." Id. (quoting Liranzo , 690 F.3d at 94 ).
"To establish a prima facie case of negligence under New York Law, a plaintiff must establish: '(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury resulting therefrom.' " Citarella v. United States , 86 F.Supp.3d 151, 154 (E.D.N.Y. 2015) (quoting Solomon v. City of New York , 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985) ).[5] The parties agree that USMS deputies owe a duty of reasonable care towards prisoners placed into their custody. (See Dkt. 222 at ¶ 70; Dkt. 224 at 50; see also Dkt. 219 at 310:20-25, 311:2-4 ("[A]ny time a law enforcement agency takes somebody into custody ... they are responsible for that person's well being.") ). In addition, the parties stipulated that the Deputies were acting within the scope of their employment at the time of the accident. (Dkt. 218 at 8:9-14; Court Exhibit 1 at ¶ 3). Plaintiff's claim is premised upon a theory of negligence; Plaintiff asserts that his injuries arise from the Deputies' breach of the duty of care owed to him. Accordingly, Plaintiff must ground this claim in an analogous doctrine under state law.
1. The "Private Analogue" Requirement[6]
Under New York law, state officials maintain a duty of care to protect inmates and other individuals in their custody from reasonably foreseeable risks of harm. See Sanchez v. State of New York , 99 N.Y.2d 247, 252-53, 754 N.Y.S.2d 621, 784 N.E.2d 675 (2002) ("Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard inmates, even from attacks by fellow inmates."); Mays v. City of Middletown , 70 A.D.3d 900, 902, 895 N.Y.S.2d 179 (2d Dep't 2010) ("Here, because the plaintiff was in their custody, the police had a duty to safeguard him against foreseeable dangers."); Williams v. State , 52 Misc. 3d 1224(A), at *6, 2012 WL 12871486 (N.Y. Ct. Cl. 2012) ("It is clear that the State owes a duty of care to protect inmates within its custody from reasonably foreseeable risks of harm."), aff'd , 137 A.D.3d 1579, 26 N.Y.S.3d 895 (4th Dep't 2016). While analogous to the claims asserted here, this doctrine quite clearly applies only to state officials , not private citizens sued under principles of New York tort law. See United States v. Olson , 546 U.S. 43, 46, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005) (stating that the FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA 'in the performance of activities which private persons do not perform.' " (quoting Indian Towing Co. v. United States , 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ) ). Although the responsibility of loading and transporting prisoners from a detention facility to a court-scheduled hearing is an inherently governmental obligation, this does not shield the Government from potential FTCA liability. See Liranzo , 690 F.3d at 94 ("[T]he fact that immigration detentions are 'uniquely governmental' does not mean they have no private analogue for present purposes.").
*162 New York tort law also recognizes an "assumed duty" theory of liability. Under this theory,
[a] defendant who voluntarily assumes a duty to act with reasonable care toward others may be held liable for breach of that duty if the plaintiff relied on the defendant's undertaking and if the defendant's act or failure to act placed the plaintiff in a more vulnerable position than if the obligation had not been assumed.
Van Hove v. Baker Commodities, Inc. , 288 A.D.2d 927, 927, 732 N.Y.S.2d 803 (4th Dep't 2001). "[A]n 'assumed duty', or a 'duty to go forward', may arise once a person undertakes a certain course of conduct upon which another relies." Heard v. City of New York , 82 N.Y.2d 66, 72, 603 N.Y.S.2d 414, 623 N.E.2d 541 (1993) (citation omitted). "One voluntarily assuming the performance of a duty 'is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task.' " Gauthier v. Super Hair , 306 A.D.2d 850, 851, 762 N.Y.S.2d 736 (4th Dep't 2003) (quoting Wolf v. City of New York , 39 N.Y.2d 568, 573, 384 N.Y.S.2d 758, 349 N.E.2d 858 (1976) ).
As noted above, it is undisputed that the USMS owes a duty to proceed with reasonable care towards a prisoner placed into its custody. By analogy, it may be said that the Deputies voluntarily assumed a duty to act with reasonable care toward the prisoners they transported, such as Plaintiff, who were in custody, and often-if not always-were handcuffed and shackled. In such a situation, it is incumbent upon the restrained prisoner to follow and rely upon the Deputies' instructions and commands. Accordingly, Plaintiff's claim is evaluated under New York's assumed duty theory of liability.
2. Plaintiff Has Not Sufficiently Demonstrated that the Deputies Breached Their Duty of Care
Certainly, if a restrained prisoner was directed to climb over a folded-down bench seat, this could foreseeably result in harm to the prisoner, thereby placing him "in a more vulnerable position than if the obligation had not been assumed," Van Hove , 288 A.D.2d at 927, 732 N.Y.S.2d 803. Put differently, by instructing a shackled inmate to enter the Vehicle's third row by climbing through the driver-side rear passenger door, over the folded-down three-quarters seat, instead of through the designed means of egress through the rear passenger-side door, the USMS deputies would have "enhanced the risk [that a plaintiff] faced, created a new risk [or] induced [a plaintiff] to forego some opportunity to avoid risk." Gauthier , 306 A.D.2d at 852, 762 N.Y.S.2d 736 (quoting Heard , 82 N.Y.2d at 73, 603 N.Y.S.2d 414, 623 N.E.2d 541 ). However, in crediting Deputy Nielsen's testimony that Plaintiff entered the Vehicle through the rear passenger-side door, the Court finds that Plaintiff has failed to demonstrate, by a preponderance of the evidence, that the Deputies breached any assumed duty to protect him against reasonably foreseeable harm.[7]
*163 There is no evidence that restrained prisoners frequently fell while entering the Expedition through the rear passenger-side door, and Deputy Nielsen's surprise after the accident occurred suggests that this was an unusual occurrence. (See Dkt. 219 at 287:1-2; Dkt. 220 at 343:19-24). Furthermore, as Plaintiff acknowledges, the primary factual dispute on the issue of negligence is whether Plaintiff entered through the rear driver-side door or the rear passenger-side door. (See Dkt. 227 at ¶ 24 ("In determining the issue of negligence it would appear the only significant fact differing between [Plaintiff]'s testimony and [Deputy] Nielsen's testimony is whether [Plaintiff] entered the transport Expedition from the rear driver's side door or rear passenger door.") ). Having determined that Plaintiff entered through the rear passenger-side door, and in light of the parties' agreement that entry through that door is the appropriate method of reaching the third row (Dkt. 222 at ¶ 21; Dkt. 224 at 17), the Court finds no indication that the Deputies breached their duty of care towards Plaintiff in doing so. In other words, Plaintiff has not demonstrated that it was reasonably foreseeable that he would fall while entering the Vehicle through the rear passenger-side door. Accordingly, to the extent that Plaintiff's assertion of negligence is based upon the method of entry into the Expedition, Plaintiff's claim fails on the merits.
Plaintiff also makes a brief, but related argument that Deputy Nielsen "failed to position himself in such a way" as to adequately assist Plaintiff in entering the Vehicle. (Dkt. 227 at 8). New York negligence law recognizes a cause of action against a private individual for the "failure to act" as a reasonably prudent person under like or similar circumstances. See Watson , 133 F.Supp.3d at 526 ("New York law recognizes 'failure to act' negligence claims."); see also Van Hove , 288 A.D.2d at 927, 732 N.Y.S.2d 803 (stating that a defendant's "failure to act" could form the basis for liability under the assumed duty theory if it "placed the plaintiff in a more vulnerable position than if the obligation had not been assumed"). Plaintiff relies on Deputy Nielsen's testimony that he did not stand "close enough to the [V]ehicle to help [Plaintiff] if he slipped or fell." (Dkt. 220 at 337:10-14; see Dkt. 227 at ¶ 30). The Court notes that even though Deputy Nielsen testified that he did not recall rendering any aid to Plaintiff as Plaintiff entered the Expedition (id. at 337:6-9), Plaintiff testified that Deputy Nielsen held onto his elbow as he entered the Vehicle (Dkt. 218 at 35:12-13). Indeed, Plaintiff explained that "you can only go in about on the first step of the seat before you're too far away for them to hold on to." (Id. at 35:13-15).
Plaintiff did not present any evidence at trial to establish that had Deputy Nielsen stood closer to the Expedition, he would have been able to prevent Plaintiff from slipping or falling. Moreover, Plaintiff also failed to present any evidence that Deputy Nielsen did not exercise reasonable care under the circumstances by standing only several feet from the Expedition. (See Dkt. 220 at 318:21-25, 319:1-3, 336:2-18 (Deputy Nielsen testifying that he would sometimes assist prisoners carry personal items, such as their lunches, if they appeared to be struggling, and that he had *164 no recollection of Plaintiff struggling on the morning of the accident); 320:12-14 (Deputy Nielsen testifying that he was watching Plaintiff "as he loaded into the [V]ehicle") ). There is simply no proof in the trial record to suggest that Deputy Nielsen's position in relation to the Vehicle "enhanced the risk" that Plaintiff faced, "created a new risk," or "induced [Plaintiff] to forego some opportunity to avoid [a] risk" of injury that he otherwise faced while entering the Vehicle. Gauthier , 306 A.D.2d at 852, 762 N.Y.S.2d 736 (quotation marks and citation omitted); see Malpeli v. Yenna , 81 A.D.3d 607, 609, 915 N.Y.S.2d 628 (2d Dep't 2011) ("[The defendant's] conduct did not place the plaintiff in a more vulnerable position than that which he otherwise would have been in by participating in such an activity.").
In sum, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that the Deputies breached any duty of care to protect Plaintiff against reasonably foreseeable harm. Having determined that Plaintiff failed to carry his burden to establish liability, the Court need not address the other evidence presented at trial pertaining to the disputed extent of Plaintiff's alleged injuries. Accordingly, the Government's motion in limine to restrict Plaintiff's potential damages award is denied as moot.
CONCLUSION
For the foregoing reasons, the Court finds NO CAUSE OF ACTION for relief and directs the Clerk of the Court to enter a judgment in favor of the Government and dismiss Plaintiff's complaint.
SO ORDERED.

Plaintiff commenced this action as a pro se litigant, but was appointed trial counsel several years into this litigation. (See Dkt. 164).

On October 13, 2009, Judge Schroeder ordered the Government to file an Amended Answer (Dkt. 62), which it did on October 15, 2009 (Dkt. 63).

The following facts are taken from the parties' written stipulation, which was entered into evidence as Court Exhibit 1 and read into the record. (Dkt. 218 at 7:21-25, 8:1-14).

Deputy Nielsen testified that Plaintiff was instructed to sit in the third row because the Deputies wanted to have a "private conversation." (Dkt. 219 at 284:18-24; see id. at 271:2-9 (Deputy Nielsen testifying that the third row was used if many prisoners were involved for a scheduled transport or if "the deputies up front wanted to have a private conversation") ).

"New York law applies because the incident occurred in this state." Qin Chen v. United States , 494 Fed.Appx. 108, 109 n.3 (2d Cir. 2012) (citing Makarova v. United States , 201 F.3d 110, 114 (2d Cir. 2000) ).

Plaintiff has not provided any argument regarding the "private analogue" requirement in his post-trial submissions.

To the extent that there is trial testimony suggesting that the Deputies could have rotated the three-quarters seat forward to permit entry to the third row, this fact does not impact the Court's conclusion as both parties agree that the proper method of entry into the Vehicle is through the rear passenger-side door. (Dkt. 222 at ¶ 21; Dkt. 224 at 17; see also Dkt. 222 at ¶ 19 (stating that the three-quarters seat did not fold up in the same manner as the one-quarter seat) ). In any event, even though Deputy Nielsen testified that his review of the Vehicle operator's manual under cross-examination revealed that the three-quarters seat could rotate forward to permit entry from the rear driver-side door, the accuracy of this testimony is suspect and is not sufficient to establish that safe access could have been permitted through the rear driver-side door. (Compare Dkt. 220 at 321:25, 322:1-13 (Deputy Nielsen testifying that even though he "didn't know" that the three-quarters seat flipped up at the time of the accident, he "think[s]" the operator's manual indicated that it could do so); with id. at 333:17-21 (testifying that the second row seat was a "bench seat" and not "two bucket seats"); and Plaintiff's Trial Exhibit 2 at 111 (indicating that the third row seat is accessible "through the passenger side rear door if your vehicle has a second row bench seat" and "through either rear door if your vehicle has second row bucket seats").